# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Corbin R. Davis

PEOPLE v CARP
PEOPLE v DAVIS
PEOPLE v ELIASON

Docket Nos. 146478, 146819, and 147428. Argued March 6, 2014 (Calendar Nos. 4, 5, and 6). Decided July 8, 2014.

Raymond Curtis Carp was charged in the St. Clair Circuit Court with first-degree murder, MCL 750.316, for his participation in the bludgeoning and stabbing of a woman. Carp was 15 years old at the time of the murder and was tried as an adult. Following Carp's conviction, the court, James P. Adair, J., imposed the mandatory sentence of life imprisonment without the possibility of parole. The Court of Appeals, SCHUETTE, P.J., and ZAHRA and OWENS, JJ., affirmed Carp's conviction in an unpublished opinion per curiam, issued December 30, 2008 (Docket No. 275084), and the Supreme Court denied his application for leave to appeal, 483 Mich 1111 (2009). His conviction and sentence became final for purposes of direct appellate review in June 2009. In September 2010, Carp sought to collaterally attack the constitutionality of his sentence by filing a motion for relief from the judgment. The trial court denied the motion, concluding that imposing a mandatory nonparolable life sentence on a juvenile convicted of first-degree murder did not constitute cruel or unusual punishment. Carp then sought leave to appeal, which the Court of Appeals denied in an unpublished order, entered June 8, 2012 (Docket No. 307758). Seventeen days later, on June 25, 2012, the United States Supreme Court decided *Miller v Alabama*, 567 US ___; 132 S Ct 2455 (2012), which held that the Eighth Amendment's prohibition of cruel and unusual punishment prohibits a sentencing scheme that mandates life in prison without parole for juvenile offenders. Carp moved for reconsideration, which the Court of Appeals granted in an unpublished order, entered August 9, 2012 (Docket No. 307758). On reconsideration, the Court of Appeals, TALBOT, P.J., and FITZGERALD and WHITBECK, JJ., determined that *Miller* had created a new rule that was procedural in nature and not subject to retroactive application under the rules set forth in *Teague v Lane*, 489 US 288 (1989), or the separate and independent Michigan test for retroactivity set forth in *People v Sexton*, 458 Mich 43 (1998), and *People v Maxson*, 482 Mich 385 (2008). 298 Mich App 472 (2012). The Supreme Court granted Carp's application for leave to appeal to consider whether *Miller* should be applied retroactively under either federal or state law. 495 Mich 890 (2013).

Cortez Roland Davis was charged in the Recorder's Court for the City of Detroit (now part of the Wayne Circuit Court) with felony murder, MCL 750.316(1)(b). Davis was 16 when he and another individual accosted two individuals to rob them. A witness testified that when

one of the victims tried to flee, Davis and the other individual fired shots, killing the victim. Davis was convicted on May 10, 1994. At sentencing, the court, Vera Massey Jones, J., initially ruled that Michigan's sentencing scheme for first-degree murder could not constitutionally be applied to juvenile homicide offenders because it was cruel and unusual to impose a nonparolable life sentence on a juvenile who was capable of rehabilitation. In concluding that Davis was capable of reforming, the court determined that his role in the commission of the offense was that of an aider and abettor, not an actual shooter, but made no findings concerning Davis's intentions about the fleeing victim or whether he had reasonably foreseen when he initially engaged in the armed robbery the possibility that a life might be taken. The court sentenced Davis to a term of imprisonment of 10 to 40 years. In an unpublished order, entered November 23, 1994 (Docket No. 176985), the Court of Appeals reversed and remanded for resentencing. At resentencing, the trial court imposed the mandatory sentence of life without parole. Direct appellate review of Davis's conviction and sentence concluded in 2000. Following habeas corpus proceedings in federal court, Davis moved for relief from the judgment in the Wayne Circuit Court in 2010, contending that *Graham v Florida*, 560 US 48 (2010), had established a retroactive change in the law by categorically barring sentences of life without parole for juveniles convicted of nonhomicide offenses. Concluding that felony murder is a homicide offense even if the defendant was an aider and abettor rather than the actual shooter, however, the trial court denied the motion. The Court of Appeals denied Davis's application for leave to appeal in an unpublished order, entered November 16, 2011 (Docket No. 304075). *Miller* was decided while Davis's application for leave to appeal was pending in the Supreme Court. The Supreme Court remanded Davis's case to the trial court for a determination of whether *Miller* applied retroactively. 492 Mich 871 (2012). On remand, the trial court concluded that *Miller* applied retroactively, entitling Davis to be resentenced. The prosecution appealed, and the Court of Appeal reversed in an unpublished order, entered January 16, 2013 (Docket No. 314080), citing *Carp*, 298 Mich App 472. The Supreme Court granted Davis leave to appeal to address whether the Eighth Amendment or Const 1963, art 1, § 16 categorically bars the imposition of a nonparolable life sentence on a juvenile convicted of felony murder under an aiding-and-abetting theory. 495 Mich 890 (2013).

Dakotah Wolfgang Eliason was charged in the Berrien Circuit Court with first-degree murder, MCL 750.316(1)(a), after he shot his sleeping stepgrandfather in the head. Eliason was 14 at the time. Following his conviction, the court, Scott Schofield, J., sentenced Eliason in October 2010 to life without parole. *Miller* was decided while Eliason's appeal was pending. The Court of Appeals, O'CONNELL and MURRAY, JJ. (GLEICHER, P.J., concurring in part and dissenting in part), held that *Miller* requires a trial court to perform an individualized sentencing analysis using the factors in *Miller* and choose whether to impose a sentence of life with or without parole. Eliason sought leave to appeal in the Supreme Court, challenging the sentencing procedures and options defined by the Court of Appeals and contending that a trial court should have the further option of imposing a sentence of a term of years. He additionally argued that Const 1963, art 1, § 16 categorically bars the imposition of nonparolable life sentences on a juvenile. The Supreme Court granted Eliason leave to appeal on both issues. 495 Mich 891 (2013). Eliason subsequently limited his second issue to juveniles who were 14 at the time of the offense.

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justices ZAHRA and VIVIANO, the Supreme Court *held*:

The rule announced in *Miller* does not satisfy either the federal test for retroactivity set forth in *Teague* or the Michigan test set forth in *Sexton* and *Maxson*. Furthermore, neither the Eighth Amendment nor Const 1963, art 1, § 16 categorically bars the imposition of a sentence of life without parole on a juvenile homicide offender.

1. The family division of the circuit court typically has initial jurisdiction under MCL 712A.4(1) of a juvenile 14 years of age or older charged with a felony. Under what is termed the "automatic waiver process," however, if the prosecution charges a juvenile with a specified juvenile violation (which includes first-degree murder), MCL 764.1f authorizes the filing of a complaint and warrant, and the circuit court itself, rather than the family division, acquires jurisdiction over the juvenile's case. MCL 712A.2(a)(1) then requires the court to try the juvenile as an adult. After *Miller* was decided, the Legislature enacted 2014 PA 22, which added MCL 769.25 and MCL 769.25a to the Code of Criminal Procedure. MCL 769.25 prescribed a new sentencing scheme for juveniles convicted of offenses that had previously required the imposition of nonparolable life sentences. The new scheme established a default sentencing range. In the absence of a prosecution motion to impose life without parole, MCL 769.25(9) requires the trial court to sentence the juvenile to a term of imprisonment that has a minimum term of not less than 25 or more than 40 years and a maximum term of not less than 60 years. If the prosecution seeks a nonparolable life sentence, MCL 769.25(6) requires the trial court to conduct a hearing on the motion as part of the sentencing process and consider the factors listed in *Miller*. MCL 769.25a(1) provides that the procedures set forth in MCL 769.25 do not apply to cases that were final for purposes of appeal on or before June 24, 2012, (the day before *Miller* was decided). MCL 769.25a(2), however, provides that if *Miller* is applied retroactively to all defendants who were under the age of 18 at the time of their crimes, the trial court will be required to decide whether to impose a sentence of imprisonment for life without parole or a term of years as set forth in MCL 769.25(9). Because each defendant in these appeals would be subject to the new sentencing rules established for juveniles by 2014 PA 22 if granted resentencing, a determination of whether *Miller* applies retroactively was necessary.

2. The form and effect of a new rule is essential in determining whether the rule applies retroactively under *Teague*. *Miller* was the product of two strands of precedent, one requiring a particular form of individualized sentencing before capital punishment may be imposed and the other addressing the constitutionality of imposing specific punishments on juvenile offenders. The capital-punishment strand of precedent prescribed rules requiring a sentencer to perform an individualized sentencing analysis that results in a decision whether to impose capital punishment. By contrast, the juvenile-sentencing strand prescribed rules that categorically bar the imposition of a particular sentence, requiring the sentencer to impose a lesser sentence in every case. The form and effect of the rule in *Miller* is similar to that of the rules in capital-punishment cases because it requires a sentencer to perform an individualized sentencing analysis that results in a decision whether to impose a nonparolable life sentence. Accordingly, whether *Miller* had to be applied retroactively depended on whether a rule with a form and effect similar to the rules in the capital-punishment cases is the type of rule entitled to retroactive application under *Teague*.

3. There is a general rule of nonretroactivity for cases on collateral review with respect to applying new constitutional rules to cases that became final before the new rule was announced. The first inquiry when determining whether a rule applies retroactively to cases presented on collateral review is whether it constitutes a new rule as defined by *Teague*. If a rule is not deemed a new rule, the general rule of nonretroactivity does not apply and the rule will be applied retroactively, even to cases on collateral review. If the rule is deemed a new rule, however, the general rule of nonretroactivity does apply and the court must engage in the second *Teague* inquiry: whether the new rule satisfies one of the two exceptions to the general rule, in which case the rule will be applied retroactively. The *Teague* exceptions provide that a new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.

4. *Miller* established a new rule because it imposed an obligation on state and lower federal courts to conduct individualized sentencing hearings before sentencing a juvenile to life without parole, including the requirement that the prosecution present evidence of aggravating factors relevant to the offender and the offense and that defendants be given the opportunity and financial resources to present evidence of mitigating factors As a result of *Miller*, a considerable number of juveniles who would previously have been sentenced to life without parole will now receive a lesser sentence.

5. In light of Carp's and Davis's arguments, it was only necessary to consider whether the rule in *Miller* fits within the first exception. Categorical rules, such as those derived from the juvenile-sentencing strand of precedent, are substantive because they have a form and effect that always results in the unconstitutionality of the punishment imposed. Conversely, noncategorical rules, such as those derived from the capital-punishment strand of precedent and *Miller*, are procedural because they have a form and effect that does not always result in the unconstitutionality of the punishment imposed. Rather, they merely require a court to perform a new or amended analysis before determining whether a given punishment can be imposed on a particular defendant. A new procedural rule creates the possibility that the defendant would have received a less severe punishment but does not necessitate such a result. Accordingly, a rule is procedural when it affects how and under what framework a punishment may be imposed but leaves intact the state's fundamental legal authority to seek the imposition of the punishment on a defendant currently subject to the punishment. Because the rule in *Miller* is procedural, *Teague* did not require its retroactive application.

6. States may give broader retroactive effect to a new rule than *Teague* requires. Michigan's retroactivity test requires consideration of three factors: (1) the purpose of the new rule, (2) the general reliance on the old rule, and (3) the effect of retroactive application on the administration of justice. The general principle of nonretroactivity for new rules of criminal procedure, to which Michigan adheres, is properly served by applying in a retroactive fashion only those new rules of procedure that implicate the guilt or innocence of a defendant. A new rule of procedure that does not affect the integrity of the fact-finding process should be given prospective effect only. Therefore, the first factor clearly militated against the retroactive application of *Miller* because *Miller* altered only the process by which a court must determine a

defendant's level of moral culpability for purposes of sentencing and had no bearing on the defendant's legal culpability for the offense. The second and third factors did not favor the retroactive application of *Miller* to the extent that they overcame the first factor's clear direction against retroactive application. In particular, there would be considerable financial, logistical, and practical barriers placed on prosecutors to re-create or relocate evidence that had previously been viewed as irrelevant and unnecessary, a task made all the more burdensome and complicated by the passage of time. This process would not further the achievement of justice under the law, and *Miller* was not entitled to retroactive application under Michigan's test.

7. Defendants asserted that the Eighth Amendment categorically bars the imposition of a nonparolable life sentence on any juvenile regardless of whether an individualized sentencing analysis occurs before that sentence is imposed, consequently requiring the resentencing of all juveniles sentenced to life without parole under the pre-*Miller* sentencing scheme and rendering invalid those portions of MCL 769.25 that allow the imposition of a nonparolable life sentence on particular juveniles following an individualized sentencing hearing. The caselaw defendants cited in support did not compel such a categorical rule, however, and defendants failed to show that the federal proportionality rule for sentences that the United States Supreme Court used in *Miller* and the juvenile-sentencing cases supported a categorical rule.

8. While the Eighth Amendment prohibits cruel and unusual punishments, Const 1963, art 1, § 16 prohibits cruel or unusual punishments. Consequently, it prohibits a punishment that is unusual but not necessarily cruel. The state test for proportionality of sentences assesses (1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in the same jurisdiction, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation. A nonparolable life sentence for a juvenile does not serve the penological goal of rehabilitation, but because only the fourth factor supported defendants' contention that their sentences were disproportionate, defendants failed to meet their burden of demonstrating that their sentences were facially unconstitutional under Const 1963, art 1, § 16.

9. Davis argued that the Eighth Amendment categorically bars imposing nonparolable life sentences on juvenile homicide offenders convicted of felony murder under an aiding-and-abetting theory, attempting to derive that categorical rule from *Miller* and *Graham*. The commission of a murder during a robbery is first-degree murder. In MCL 767.39, the Legislature chose to treat offenders who aid and abet the commission of an offense exactly the same as those offenders who more directly commit the offense, in particular subjecting them to the same punishment. This legislative choice is entitled to great weight, and Davis failed to persuade the Court that it should establish a categorical rule.

10. Eliason asserted that Const 1963, art 1, § 16 categorically bars the imposition of a nonparolable life sentence on a juvenile homicide offender who was 14 years of age at the time of the offense. Because Eliason's case was on direct review, however, he was entitled to resentencing under MCL 769.25(1)(b)(*ii*) and subject to a default sentence of a term of years. A juvenile will only face life without parole if the prosecution seeks that sentence and the trial court concludes that the sentence is appropriate following an individualized sentencing hearing

in accordance with *Miller*. Even though the prosecution had filed a motion for imposition of a nonparolable life sentence, whether the trial court will depart from the default sentence on resentencing would only be speculation and it was not apparent that Eliason faced a real and immediate threat of receiving life without parole. Accordingly, his facial constitutional challenge was no longer justiciably ripe.

*Carp* and *Davis* affirmed.

*Eliason* remanded for resentencing.

Justice KELLY, joined by Justices CAVANAGH and MCCORMACK, dissenting, would have concluded that *Miller* applies retroactively to cases on collateral review because it established a substantive rule and because state law alternatively compelled its retroactive application. The United States Supreme Court has established in numerous cases that juveniles are different as a matter of constitutional law. *Miller* determined that because certain juvenile homicide offenders have diminished culpability for their crimes compared to adult offenders and greater prospects for reform, states cannot subject juvenile homicide offenders to mandatory nonparolable life sentences. Accordingly, *Miller* expanded the range of punishments available to juveniles in states that had previously mandated a nonparolable life sentence for juveniles convicted of first-degree murder. *Miller* required sentencers to consider an offender's youth and attendant characteristics before imposing a nonparolable life sentence. Under *Miller*, age affects the range of sentences that can be imposed on someone convicted of first-degree murder. *Miller* produced a class of persons subject to a different range of sentences and therefore established a substantive rule of law that applies retroactively under the *Teague* framework. While *Miller* did not foreclose sentencers from imposing nonparolable life sentences on juveniles in appropriate cases, it categorically barred a mandatory nonparolable life sentence for those offenders. The *Teague* analysis focuses on whether the decision is substantive or procedural, not on whether it is categorical or noncategorical, but even if all categorical bars are substantive, it does not follow that all noncategorical bars must be procedural. The fact that *Miller* did not categorically bar nonparolable life sentences for juvenile offenders did not negate the substantive import of its decision to invalidate mandatory nonparolable life sentences as applied to juvenile offenders. *Miller* did more than merely allocate decision-making authority; it altered the range of punishments available to a juvenile homicide offender by requiring that a state's mandatory minimum punishment be something less than nonparolable life. *Miller* involved not just who exercises the decision-making authority when imposing punishment, but what punishments must be considered. Accordingly, Justice KELLY would have held that *Miller* applies retroactively to cases on collateral review. Furthermore, the first factor that a reviewing court must consider in assessing a new rule's retroactivity under the state test for retroactivity is the purpose of the new rule. While sentencing procedures do not concern the ascertainment of guilt or innocence for the underlying offense, sentencing is a fact-finding process that allows the sentencer to ascertain an offender's culpability for the offense. *Miller* mandated a new fact-finding process to determine whether a nonparolable life sentence is appropriate in a particular case and, as a result, the first factor supported the retroactive application of *Miller*. The second factor examines whether individuals have been adversely positioned in reliance on the old rule. Carp and Davis were adversely positioned because the trial courts did not have the discretion to impose any sentence but nonparolable life, there was no basis before *Miller* to appeal this lack of discretion, and it is

likely that many of the juvenile offenders already serving nonparolable life sentences would have been sentenced to a term of years had they received a sentencing hearing. The third factor examines whether applying the new rule retroactively would undermine the state's strong interest in finality of the criminal justice process. Applying *Miller* retroactively would not affect the finality of convictions in this state, but would only require an individualized resentencing process for the relatively small class of prisoners sentenced to nonparolable life for homicides they committed as juveniles. Because each factor of the state test supported it, Justice KELLY would have held that independent state-law grounds also existed to apply *Miller* retroactively. Justice KELLY would have reversed the judgments of the Court of Appeals in *Carp* and *Davis* and remanded all three cases to the trial courts for resentencing.

©2014 State of Michigan

# Opinion

Chief Justice:        Justices:
Robert P. Young, Jr.   Michael F. Cavanagh
                       Stephen J. Markman
                       Mary Beth Kelly
                       Brian K. Zahra
                       Bridget M. McCormack
                       David F. Viviano

FILED July 8, 2014

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                   No.146478

RAYMOND CURTIS CARP,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                   No. 146819

CORTEZ ROLAND DAVIS,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

> Plaintiff-Appellee,

v                                                    No. 147428

DAKOTAH WOLFGANG ELIASON,

> Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to address (1) whether *Miller v Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012), should be applied retroactively-- pursuant to either the federal or state test for retroactivity-- to cases in which the defendant's sentence became final for purposes of direct appellate review before *Miller* was decided and (2) whether the Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16 categorically bars the imposition of a life-without-parole sentence on a juvenile homicide offender.  After considering these matters, we hold that the rule announced in *Miller* does not satisfy either the federal test for retroactivity set forth in *Teague v Lane*, 489 US 288; 109 S Ct 1060; 103 L Ed 2d 334 (1989), or Michigan's separate and independent test for retroactivity set forth in *People v Sexton*, 458 Mich 43; 580 NW2d 404 (1998), and *People v Maxson*, 482 Mich 385; 759 NW2d 817 (2008).  We further hold that neither the Eighth Amendment nor Const 1963, art 1, § 16 categorically bars the imposition of a life-without-parole sentence on a juvenile homicide offender.

# I. FACTS AND HISTORY

## A. DEFENDANT CARP

Defendant Raymond Carp was 15 years of age when he participated in the 2006 bludgeoning and stabbing of Mary Ann McNeely in Casco Township. He was charged with first-degree murder in violation of MCL 750.316 and tried as an adult. On October 5, 2006, a St. Clair County jury convicted Carp of this offense, and in accordance with the law he was sentenced to life imprisonment without parole. Carp's conviction was subsequently affirmed by the Court of Appeals, *People v Carp*, unpublished opinion per curiam of the Court of Appeals, issued December 30, 2008 (Docket No. 275084), and his application for leave to appeal in this Court was denied on June 23, 2009, *People v Carp*, 483 Mich 1111 (2009). Because Carp did not seek review in the United States Supreme Court, his conviction and sentence became final for the purposes of direct appellate review on June 23, 2009.

In September 2010, Carp sought to collaterally attack the constitutionality of his sentence by filing a motion for relief from judgment pursuant to MCR 6.501 *et seq*. The trial court denied this motion, concluding that the imposition of a mandatory sentence of life without parole on a juvenile first-degree-murder offender did not constitute cruel or unusual punishment, citing *People v Launsburry*, 217 Mich App 358, 363-365; 551 NW2d 460 (1996), lv den 454 Mich 883 (1997), and recon den 454 Mich 883 (1997). Carp then sought leave to appeal in the Court of Appeals, which was denied on June 8, 2012. *People v Carp*, unpublished order of the Court of Appeals, entered June 8, 2012 (Docket No. 307758). Seventeen days later, the United States Supreme Court issued its decision in *Miller*, leading Carp to move for reconsideration, and the Court of Appeals

granted his motion. *People v Carp*, unpublished order of the Court of Appeals, entered August 9, 2012 (Docket No. 307758). On reconsideration, the Court determined that *Miller* had created a "new rule" that was "procedural" in nature and therefore not subject to retroactive application under the rules set forth in *Teague*. *People v Carp*, 298 Mich App 472, 511-515; 828 NW2d 685 (2012). The Court further held that *Miller* was not subject to retroactive application under Michigan's separate test for retroactivity set forth in *Sexton* and *Maxson*.[1] *Id*. at 520-522. This Court subsequently granted Carp leave to appeal with respect to whether *Miller* should be applied retroactively under either federal or state law. *People v Carp*, 495 Mich 890 (2013).

## B. DEFENDANT DAVIS

Defendant Cortez Davis, age 16 at the time of his offense, and one of his cohorts, while both brandishing firearms, accosted two individuals in Detroit for the purpose of robbery.[2] Two witnesses testified that when one of the victims attempted to flee, Davis and his cohort fired five or six shots, killing the victim. Davis was charged with felony first-degree murder in violation of MCL 750.316(1)(b) and convicted by a jury in the former Recorders Court for the City of Detroit (now part of the Wayne Circuit Court) on this charge on May 10, 1994.

---

[1] The Court of Appeals also opined in dictum how *Miller* should be applied by trial courts in resentencing juvenile first-degree-murder offenders in cases that were not presented on collateral review. *Carp*, 298 Mich App at 523-537.

[2] At trial, Davis testified that he had not participated in the robbery, but that a third cohort, "Shay-man," and the other cohort, had committed the offense without Davis's help or encouragement.

4

At sentencing, the trial court initially ruled that Michigan's statutory sentencing scheme for first-degree murder could not constitutionally be applied to juvenile homicide offenders because it was "cruel and unusual" to impose a sentence of life without parole on a juvenile who was "capable of rehabilitation." In concluding that Davis was such an individual, the court surmised that Davis's role in the commission of the offense was that of an aider and abettor, not an actual shooter. The court, however, did not make any finding concerning Davis's intentions with respect to the fleeing victim or whether he reasonably foresaw the possibility that a life might be taken when he initially engaged in the armed robbery. The trial court thereupon sentenced Davis to a term of imprisonment of 10 to 40 years.

On appeal, however, the Court of Appeals reversed and remanded for resentencing pursuant to Michigan's statutory sentencing scheme, *People v Davis*, unpublished order of the Court of Appeals, entered November 23, 1994 (Docket No. 176985), and at resentencing, the trial court imposed the required sentence of life without parole. Direct appellate review of defendant's conviction and sentence concluded in 2000. *People v Davis*, unpublished order of the Court of Appeals, entered June 15, 2000 (Docket No. 224046).[3]

---

[3] A federal district court dismissed Davis's federal habeas petition, expressly rejecting his contention "that there was insufficient evidence to convict him of first-degree felony murder." *Davis v Jackson*, unpublished opinion and order of the United States District Court for the Eastern District of Michigan, issued April 30, 2008 (Docket No. 01-CV-72747), p 9. The court relied on the surviving victim's "testi[mony] that both [Davis] and his co-defendant fired their weapons at the decedent." *Id.* Davis challenged the credibility of this witness, but the court rejected this assertion because "[t]he testimony of a single, uncorroborated prosecuting witness or other eyewitness is generally sufficient to

In 2010, Davis filed his current motion for relief from judgment, contending that *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010), constituted a "retroactive change in the law" in that it categorically barred life-without-parole sentences for juveniles convicted of nonhomicide offenses. Concluding, however, that felony murder is in fact a "homicide offense," even when the defendant is not the actual shooter but an aider and abettor, the trial court denied this motion. The Court of Appeals denied Davis's application for leave to appeal. *People v Davis*, unpublished order of the Court of Appeals, entered November 16, 2011 (Docket No. 304075). While Davis's application for leave to appeal in this Court was pending, the United States Supreme Court issued its decision in *Miller*. In light of *Miller*, Davis's case was remanded to the trial court for a determination of whether *Miller* applied retroactively. *People v Davis*, 492 Mich 871 (2012). On remand, the trial court concluded that *Miller* did apply retroactively, entitling Davis to be resentenced. The prosecutor then appealed, and the Court of Appeals reversed. *People v Davis*, unpublished order of the Court of Appeals, entered January 16, 2013 (Docket No. 314080), citing *Carp*, 289 Mich App 472. Davis again sought leave to appeal in this Court, which we granted to address whether the

support a conviction, so long as the prosecution presents evidence which establishes the elements of the offense beyond a reasonable doubt." *Id*. at 11. The court later denied Davis's request for a certificate of appealability. *Davis v Jackson*, unpublished order of the United States District Court for the Eastern District of Michigan, entered June 4, 2008 (Docket No. 01-CV-72747). The United States Court of Appeals for the Sixth Circuit affirmed this denial, stating that "[a]n eyewitness . . . testified that both Davis and his co-perpetrator fired shots at the decedent." *Davis v Jackson*, unpublished order of the United States Court of Appeals for the Sixth Circuit, entered July 14, 2009 (Docket No. 08-1717), p 2.

Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16 categorically bars imposing a sentence of life without parole on a juvenile convicted of felony murder on aiding-and-abetting grounds. *People v Davis*, 495 Mich 890 (2013).

## C.  DEFENDANT ELIASON

Unlike Carp and Davis, whose sentences became final for purposes of direct review before *Miller* was decided, at least 10 defendants were convicted and sentenced before *Miller*, but their cases were on direct appeal at the time *Miller* was decided. Dakotah Eliason is one of those defendants.  At age 14, Eliason, without provocation and after hours of deliberation, fired a single deadly shot into the head of his stepgrandfather as he slept in his Niles Township home.  Eliason was charged with first-degree murder in violation of MCL 750.316(1)(a) in the Berrien Circuit Court, convicted by a jury, and sentenced in October 2010 to life without parole.

While Eliason's appeal was pending before the Court of Appeals, *Miller* was decided.  In assessing the effect of *Miller* on Michigan's sentencing scheme for juvenile first-degree-murder offenders, the Court of Appeals held that a trial court must as a result of *Miller* perform an individualized sentencing analysis based upon the factors identified in *Miller*.  *People v Eliason*, 300 Mich App 293, 309-311; 833 NW2d 357 (2013), citing *Carp*, 289 Mich App at 522-532.  Using this analysis, the trial court must then choose between imposing a sentence of life with or without parole.  *Eliason*, 300 Mich App at 310.  Eliason sought leave to appeal in this Court, challenging the sentencing procedures and options defined by the Court of Appeals, contending that the trial court should have the further option of imposing a sentence of a term of years.  Eliason additionally argued

7

that Const 1963, art 1, § 16 categorically bars the imposition of a life-without-parole sentence on a juvenile. We granted leave to appeal on both issues. *People v Eliason*, 495 Mich 891 (2013).

## II. MICHIGAN STATUTES

Pending our resolution of this appeal, and in response to *Miller*, the Legislature enacted, and the Governor signed into law, 2014 PA 22, now codified as MCL 769.25 and MCL 769.25a. This law significantly altered Michigan's sentencing scheme for juvenile offenders convicted of crimes that had previously carried a sentence of life without parole.

## A. PRE-*MILLER*

To understand the full context of defendants' appeals and the relief each seeks in reliance on *Miller*, it is necessary first to delineate the pre-*Miller* statutes that controlled the trial and sentencing of juvenile first-degree-murder offenders in Michigan. Each defendant before this Court was charged with first-degree murder under MCL 750.316. When a juvenile defendant "14 years of age or older" is charged with a felony, the family division of the circuit court would typically possess initial jurisdiction. MCL 712A.4(1). However, when a juvenile is charged with a "specified juvenile violation," including first-degree murder in violation of MCL 750.316, "the prosecuting attorney may authorize the filing of a complaint and warrant on the charge . . . ." MCL 764.1f. If the prosecutor does so, the circuit court itself, rather than the family division of the circuit court, acquires jurisdiction over the juvenile defendant's case and must try that person as an adult. See MCL 712A.2(a)(1).

8

This process has been termed the "automatic waiver process" because the Legislature has vested exclusively in the prosecutor the executive discretion to charge and try a juvenile as an adult when the juvenile stands accused of first-degree murder. *People v Conat*, 238 Mich App 134, 141-142; 605 NW2d 49 (1999). The prosecutors in the instant three cases filed complaints and warrants placing the cases within the jurisdiction of the circuit court, where each defendant was then tried and convicted as an adult. When this occurs and the offense is included in an enumerated subset of specified juvenile violations (which includes first-degree murder), "[t]he court shall sentence a juvenile . . . in the same manner as an adult[.]" MCL 769.1(1). Because an adult convicted of first-degree murder "shall be punished by imprisonment for life," MCL 750.316(1), and is not eligible for parole, MCL 791.234(6)(a), defendants were ultimately sentenced to terms of life without parole. Each defendant now seeks resentencing and, pursuant to the statutory response to *Miller*, would, if granted resentencing, be subject to the new sentencing rules established for juveniles by 2014 PA 22.

## B. POST-*MILLER*

MCL 769.25, enacted in response to *Miller*, prescribes a new sentencing scheme for juveniles convicted of violating certain provisions of Michigan laws, such as MCL 750.316, that had previously carried with them a fixed sentence of life without parole. The effect of MCL 769.25 is that even juveniles who commit the most serious offenses against the laws of this state may no longer be sentenced under the same sentencing rules and procedures as those that apply to adults who commit the same offenses. Rather than

9

imposing fixed sentences of life without parole on all defendants convicted of violating

MCL 750.316, MCL 769.25 now establishes a default sentencing range for individuals

who commit first-degree murder before turning 18 years of age.  Pursuant to the new law,

absent a motion by the prosecutor seeking a sentence of life without parole,

> the court shall sentence the individual to a term of imprisonment for which
> the maximum term shall be not less than 60 years and the minimum term
> shall be not less than 25 years or more than 40 years.  [MCL 769.25(4) and
> (9).]

When, however, the prosecutor does file a motion seeking a life-without-parole sentence,

the trial court "shall conduct a hearing on the motion as part of the sentencing process"

and "shall consider the factors listed in Miller v Alabama . . . ."   MCL 769.25(6).

Accordingly, the sentencing of juvenile first-degree-murder offenders now provides for

the so-called "individualized sentencing" procedures of *Miller*.

In adopting this new sentencing scheme, the Legislature was clearly cognizant of

the issue surrounding whether *Miller* was to be applied retroactively.  In defining the

scope of the new scheme, the Legislature asserted that "the procedures set forth in

[MCL 769.25] do not apply to any case that is final for purposes of appeal on or before

June 24, 2012 [the day before the United States Supreme Court's decision in *Miller*]."

MCL 769.25a(1).  Instead, the Legislature specified:

> If the state supreme court or the United States supreme court finds
> that the decision of the United States supreme court in Miller v Alabama,
> [567] US ___; 183 L Ed 2d 407; 132 S Ct 2455 (2012), applies
> retroactively to all defendants who were under the age of 18 at the time of
> their crimes, and that decision is final for appellate purposes, the
> determination of whether a sentence of imprisonment for a violation set
> forth in [MCL 769.25(2)] shall be imprisonment for life without parole
> eligibility or a term of years as set forth in [MCL 769.25(9)] shall be made

10

by the sentencing judge or his or her successor as provided in this section. [MCL 769.25a(2).][4]

We now take up the question identified in MCL 769.25a(2)-- whether *Miller* must be applied retroactively.

### III.  STANDARD OF REVIEW

Whether a decision of the United States Supreme Court applies retroactively under either federal or state retroactivity rules poses a question of law that is reviewed de novo. *Maxson*, 482 Mich at 387.  Whether a statute is constitutional also poses a question of law that is reviewed de novo.  *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009).  When the constitutionality of a statute is brought into question, "[t]he party challenging [it] has the burden of proving its invalidity."  *People v Thomas*, 201 Mich App 111, 117; 505 NW2d 873 (1993).  To sustain its burden, the party challenging the statute must overcome the presumption that a statute is constitutional, and the statute "will not be declared unconstitutional unless clearly so, or so beyond a reasonable doubt."  *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939).  Furthermore, a "party challenging the facial constitutionality of a statute faces an extremely rigorous standard, and must show that no set of circumstances exists under which the [a]ct would be valid." *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007) (citations and quotation marks omitted).

---

[4] MCL 769.25a(3) contains a similar exception to the prospective application of MCL 769.25 in the event that this Court or the United States Supreme Court holds that *Miller* applies retroactively to juvenile first-degree-murder offenders convicted on a felony-murder theory under MCL 750.316(1)(b).

11

## IV. ANALYSIS

To determine whether *Miller* must be applied retroactively, it is helpful to first identify exactly what *Miller* held by way of understanding what precedents were relied on in forming its rule. *Miller* is the product of "two strands of precedent," one requiring a particular form of individualized sentencing before capital punishment can be imposed and the other addressing the constitutionality of imposing specific punishments on juvenile offenders. *Miller*, 567 US at ___; 132 S Ct at 2463-2464. We now consider both strands of precedent with the purpose of identifying what is required by the rules formed from each strand of precedent and then comparing and contrasting what is required by each with what is required by the rule in *Miller* in order to determine whether the latter rule should be applied retroactively.

### A. GENESIS OF *MILLER*

### 1. CAPITAL-PUNISHMENT STRAND

In *Furman v Georgia*, 408 US 238; 92 S Ct 2726; 33 L Ed 2d 346 (1972), the United States Supreme Court decided 5-4 in seven separate opinions that it constituted cruel and unusual punishment in violation of the Eighth Amendment to impose capital punishment pursuant to a sentencing scheme that, in its words, "vested the [sentencer] with complete and unguided discretion to impose the death penalty . . . ." *Beck v Alabama*, 447 US 625, 639; 100 S Ct 2382; 65 L Ed 2d 392 (1980). In response, some states enacted sentencing schemes requiring the imposition of capital punishment for select crimes by way of the *mandatory* operation of law. *Woodson v North Carolina*, 428 US 280, 286-287, 298; 96 S Ct 2978; 49 L Ed 2d 944 (1976). Those sentencing schemes

12

were also challenged on Eighth Amendment grounds in *Woodson*, with the Court understanding the case as challenging not the state's ability to impose capital punishment but "the *procedure* employed by the State to select persons for the . . . penalty of death." *Id*. at 287 (emphasis added).

In *Woodson*, the Court, in another 5-4 decision, held that those schemes were unconstitutional. The plurality opinion viewed as unconstitutional sentencing schemes that employed a process that did not permit for "the prevailing practice of individualizing sentencing determinations" as part of the process for imposing capital punishment. *Id*. at 303-304 (opinion of Stewart, Powell, and Stevens, JJ.). Accordingly, post-*Woodson*, capital punishment could only be constitutionally imposed after "consideration of the character and record of the individual offender and the circumstances of the particular offense . . . ." *Id*. at 304. Notably, however, on the same day that the United States Supreme Court decided *Woodson*, it also declined to categorically bar the imposition of capital punishment. *Gregg v Georgia*, 428 US 153; 96 S Ct 2909; 49 L Ed 2d 859 (1976).

Following *Woodson* and *Gregg*, the United States Supreme Court confronted two additional cases challenging whether the sentencing procedures employed to impose capital punishment complied with *Woodson*'s requirement of individualized sentencing determinations. See *Lockett v Ohio*, 438 US 586; 98 S Ct 2954; 57 L Ed 2d 973 (1978), and *Eddings v Oklahoma*, 455 US 104; 102 S Ct 869; 71 L Ed 2d 1 (1982). Both *Lockett* and *Eddings* were cited in *Miller* as part of the capital-punishment strand of precedent that culminated in *Miller*. *Miller*, 567 US at ___; 132 S Ct at 2467. The plurality opinion

in *Lockett* stated that statutory schemes authorizing capital punishment must permit the sentencer to consider all forms of mitigating evidence relating to two measuring points for determining the propriety of the sentence-- evidence relating to the defendant's "character or record and any of the circumstances of the offense . . . ." *Lockett*, 438 US at 604 (opinion by Burger, C.J.). Relevantly listed as factors that the sentencer must be permitted to consider were the defendant's "role in the offense" and the defendant's "age." *Id*. at 608.

In *Eddings*, the Court, in a 5-4 decision, applied *Lockett* to a case in which the trial court, in considering mitigating factors before imposing capital punishment, declined to consider either the defendant's family background, including the physical abuse and neglect he had suffered, or the fact that he suffered from an alleged "personality disorder." *Eddings*, 455 US at 112-113. The Court ruled that while a sentencer may "determine the weight to be given relevant mitigating evidence," the sentencer may not decide to give a piece of relevant mitigating evidence "no weight by [altogether] excluding such evidence from . . . consideration." *Id*. at 114-115. Under *Lockett* and *Eddings*, in which individualized sentencing is required, not only must statutory procedures for imposing capital punishment permit the defendant to present all relevant mitigating evidence, but the sentencer must also consider and accord some weight to that evidence. *Id*. at 112-115.

## 2. JUVENILE-SENTENCING STRAND

The second strand of precedent was developed in two cases, *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), and *Graham*. *Roper* and *Graham*

were understood by the Court in *Miller* to have "establish[ed] that children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 US at ___; 132 S Ct at 2464. This constitutional distinction has resulted in downward alterations in *Roper* and *Graham* in the range of punishments that the state may constitutionally impose on juvenile offenders. When the rules from *Roper* and *Graham* are considered together, a state may only impose a sentence of life without parole on a juvenile for the commission of an offense that if committed by an adult would constitutionally permit the state to punish the adult by capital punishment.

In *Roper*, the Court held that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Roper*, 543 US at 578. The Court characterized the rule it was adopting as a "categorical rule." *Id*. at 572.[5] The subsequent decision in *Graham* adopted what the Court again characterized as a "categorical rule," i.e., that a sentence of life without parole could not be imposed on a juvenile nonhomicide offender. *Graham*, 560 US at 79. In reaching this conclusion, *Graham* drew comparisons between a capital sentence for an adult offender and a life-without-parole sentence for a juvenile offender. *Id*. at 69-70. To justify this categorical rule, the Court relied on the factors identified in

---

[5] The Court's basis for prescribing this rule, distinguishing between adult and juvenile offenders for purposes of constitutional analysis, rested on three factors: (1) juveniles, by way of their "lack of maturity," tend to engage in "impetuous and ill-considered actions," (2) "juveniles are more vulnerable or susceptible to negative influences and outside pressures" because they "have less control . . . over their own environment," and (3) "the character of a juvenile is not as well formed as that of an adult." *Roper*, 543 US at 569-570 (citation and quotation marks omitted).

15

*Roper* that assertedly distinguished juvenile and adult offenders. *Id*. at 68, citing *Roper*, 543 US at 569-570. The Court also supported its prohibition of life-without-parole sentences for juvenile nonhomicide offenders by concluding that the goals of punishment (retribution, deterrence, incapacitation, and rehabilitation) are not furthered when a nonparolable life sentence is imposed. *Id*. at 71-74. Combining strands of precedent that were previously limited to capital sentences and juvenile nonhomicide offenders respectively, and holding for the first time that these separate strands were relevant to noncapital sentences for juvenile homicide offenders, the United States Supreme Court reached its holding in *Miller*.

### 3. *MILLER v ALABAMA*

*Miller v Alabama* created the rule that Carp and Davis seek to have applied retroactively. Having identified what is required by the rules from each of the two strands of precedent that underlie *Miller*, we now identify what is required by the rule in *Miller* in order to determine whether *Miller* is more like the juvenile-sentencing strand whose rules have applied retroactively under *Teague* or more like the capital-punishment strand whose rules have not been applied retroactively under *Teague*. We compare and contrast the rule in *Miller* in this way because, as discussed later, the "form and effect" of a rule is essential in determining whether a rule is to be applied retroactively under *Teague*. One form of a rule will produce a single invariable result, or a single effect, when applied to *any* defendant in the class of defendants to whom the rule is pertinent. Another form of a rule will produce a range of results, or have multiple possible effects, when applied to *different* defendants in the class of defendants to whom the rule is

16

pertinent. The form and effect of the rules derived from the capital-punishment strand of precedent varies considerably from the form and effect of the rules derived from the juvenile-sentencing strand of precedent, and this variance has markedly different consequences for the question of retroactivity. The capital-punishment strand of precedent prescribed rules that require a sentencer to perform an individualized sentencing analysis resulting in capital punishment being *either* imposed or not. By contrast, the juvenile-sentencing strand of precedent prescribed rules that categorically bar the imposition of a particular sentence, requiring the sentencer to impose a lesser sentence in every case. The former class of rules does not clearly satisfy the test for retroactivity, while the latter class of rules does. In assessing whether the form and effect of the rule in *Miller* is more akin to that of the capital-punishment strand of precedent, and therefore less clearly retroactive, or more akin to the juvenile-sentencing strand of precedent, and therefore more clearly retroactive, we find it important to examine what *Miller* itself stated about the form and effect of its own holding.

*Miller* held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 US at ___; 132 S Ct at 2469. Within the very same paragraph in which *Miller* announced this holding, the Court also stated that its decision "require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at ___; 132 S Ct at 2469. *Miller* then provides substantial details regarding what must be considered as part of the

17

individualized sentencing process before a sentence of life without parole can be imposed

on a juvenile:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him— and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. [*Id*. at ___; 132 S Ct at 2468 (citation omitted).]

*Miller*'s summarization of what the trial court must evaluate as part of the new

individualized sentencing process tracks in large part the two measuring points about

which a defendant must be allowed to present mitigating evidence within the capital-

punishment context of *Lockett*-- evidence relating to "the 'circumstances of the particular

offense and [to] the character and propensities of the offender.' " *Id*. ___ n 9; 132 S Ct at

at 2471 n 9, quoting *Roberts v Louisiana*, 428 US 325, 333; 96 S Ct 3001; 49 L Ed 2d

974 (1976) (opinion of Stewart, Powell, and Stevens, JJ.), and citing *Sumner v Shuman*,

483 US 66; 107 S Ct 2716; 97 L Ed 2d 56 (1987). Although the focus of the rule in

*Miller*-- life-without-parole sentences for juvenile offenders-- is, of course, distinct from

the focus of the rules in capital-punishment cases, the form and effect of the rule in *Miller*

is quite similar to that of the rules in capital-punishment cases. That is, the rule in *Miller*

requires a sentencer to perform an individualized sentencing analysis resulting in a life-

without-parole sentence being *either* imposed or not, very much like the capital-punishment cases require a sentencer to perform an individualized sentencing analysis resulting in capital punishment being *either* imposed or not.

It is considerably more difficult to draw the same comparison between the rule in *Miller* and the categorical rules in *Graham* and *Roper*. Indeed, the United States Supreme Court itself specifically distinguished the form and effect of these rules:

> Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty. [*Miller*, 567 US at ___; 132 S Ct at 2471.][6]

---

[6] This is but one of several statements from *Miller* highlighting the limited effect of its rule as it pertains to requiring "a certain process" rather than "categorically bar[ring] a penalty." In the paragraph in which it describes its holding and addresses the sentencer's obligations before imposing a life-without-parole sentence, the Court stated, "[W]e do not foreclose a sentencer's ability to make that judgment in homicide cases . . . ." *Id.* at ___; 132 S Ct at 2469. Additionally, in discussing the breadth of its holding, the Court stated unequivocally that it has not placed any bar on imposing a life-without-parole sentence on juvenile homicide offenders because it had declined to even reach the question of whether the Eighth Amendment requires such a bar. See *id.* at ___; 132 S Ct at 2469 ("[W]e do not consider Jackson's and Miller's alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles . . . ."). Indeed, the only opinion in *Miller* even to entertain the possibility that the Eighth Amendment imposes a categorical bar on life-without-parole sentences for juvenile homicide offenders was Justice Breyer's concurrence, joined in only by Justice Sotomayor, in which he stated,

> Given *Graham*'s reasoning, the kinds of homicide that can subject a juvenile offender to life without parole must exclude instances where the juvenile himself neither kills nor intends to kill the victim. [*Id.* at ___; 132 S Ct at 2475-2476 (Breyer, J., concurring).]

Had the Court itself adopted Justice Breyer's proposed rule, then *Miller* might be said to have the same form and effect of the categorical rules adopted in *Graham* and *Roper*, but

19

Thus, rather than relying on *Graham* and *Roper* to give form and effect to *Miller*, in the same manner as the capital-punishment decisions, the Court relied on *Graham* and *Roper* in *Miller* only for a generalized "principle" regarding juvenile offenders. *Id*. at ___; 132 S Ct at 2471, 2472 n 11. That is, *Miller* relied on *Graham* and *Roper* for the general principle of law that juveniles possess different mental faculties than adults, so the United States Constitution requires that they be treated differently than adults for sentencing purposes with respect to the imposition of capital punishment and sentences of life without parole. Although this principle of law explains why the United States Supreme Court found it necessary to adopt the rule in *Miller*, it has no bearing on the actual form and effect of the rule adopted in *Miller*. Accordingly, because the form and effect of a rule rather than the principle underlying the rule's formation controls whether the rule must be applied retroactively under federal retroactivity rules, whether *Miller* must be applied retroactively will center on whether a rule with a form and effect similar to the rules in *Woodson*, *Lockett*, and *Eddings* (rather than *Roper* and *Graham*) is the type of

---

the Court did not. The dissent in this case further errs in its attempt to read the rule in *Miller* and the rule proposed by Justice Breyer as one and the same. See *post* at 19 n 67. Whereas the rule proposed by Justice Breyer draws a bright line, foreclosing the state's ability to impose a sentence of life without parole for a juvenile convicted of a homicide offense in which the juvenile offender did not kill or intend to kill, the rule in *Miller* does not foreclose imposing a life-without-parole sentence on such an offender. This is because the rule in *Miller*, unlike that proposed by Justice Breyer, requires a sentencer to look at not only the circumstances of the offense, but also at the characteristics of the defendant such that a juvenile homicide offender who did not kill or intend to kill could be sentenced to life without parole if the offender, for example, possessed a prior criminal record, showed no signs of amenability to rehabilitation, and exhibited mental faculties similar to those possessed by an adult offender.

rule entitled to retroactive application under *Teague*.[7]  With this in mind, we next define

*Teague*'s federal retroactivity test so as to determine whether the rule in *Miller* is entitled

to retroactive application under that test.

## B.  FEDERAL RETROACTIVITY

### 1.  GENERAL OVERVIEW

There is a "general rule of *nonretroactivity* for cases on collateral review" when it

comes to applying new constitutional rules to cases that became final before the new rule

was announced.[8]  *Teague*, 489 US at 307 (opinion by O'Connor, J).  This default rule is

driven by "the principle of finality which is essential to the operation of our criminal

justice system."  *Id*. at 309.  Supporting this same principle are concerns arising from the

burdens placed on the administration of justice when new rules are applied retroactively,

in that "[t]he 'costs imposed upon the State[s] by retroactive application of new rules of

constitutional law on [collateral review] generally far outweigh the benefits of this

---

[7] The dissent does not appear to dispute that the rule in *Miller* has the form and effect of the rules from *Woodson*, *Lockett*, and *Eddings*, rather than those from *Roper* and *Graham*, when it describes the latter decisions as having "forbade" and "prohibited" specific types of punishments as applied to juveniles while describing *Miller* as having "struck down a sentencing scheme."  *Post* at 5.

[8] This general rule of nonretroactivity stands in contrast to the general rule requiring the retroactive application of new rules to cases that have not become final for purposes of direct appellate review before the new rule is announced.  *Griffith v Kentucky*, 479 US 314, 328; 107 S Ct 708; 93 L Ed 2d 649 (1987).

application.' "[9]  *Id*. at 310, quoting *Solem v Stumes*, 465 US 638, 654; 104 S Ct 1338; 79 L Ed 2d 579 (1984) (second alteration in original).

For this reason, the first inquiry in which a court must engage when determining whether a rule applies retroactively to cases presented on collateral review concerns whether the rule constitutes a "new rule" as defined by *Teague*, 489 US at 299-301 (opinion by O'Connor, J.), and *Penry v Lynaugh*, 492 US 302, 329; 109 S Ct 2934; 106 L

---

[9] By our count, Carp and Davis are 2 of 334 defendants currently serving life-without-parole sentences in Michigan for crimes committed before they turned 18 years of age whose sentences became final for purposes of direct review before the Supreme Court's decision in *Miller*. To fully understand the effect of applying *Miller* retroactively, it may be helpful to briefly consider the demographics and case histories of the defendants who would be entitled to resentencing if *Miller* is applied retroactively. There are at least two reasons why these factors are relevant to the *Miller* analysis: first, *Miller* focuses its individualized sentencing analysis on the defendant's circumstances and personal characteristics *at the time* of the offense, so any retroactive application of *Miller* necessarily requires an analysis specific to that time, however long ago it may have been. The older the case generally, the greater the state's interest in finality and, concomitantly, the more burdensome it is likely to be to accurately reconstruct what characterized the offense and the offender at that time. Second, because *Miller* identifies age and mental development as two consequential factors in determining whether a life-without-parole sentence is constitutionally permissible for a juvenile offender, that sentence is increasingly likely to be permissible the closer an offender was to 18 years of age at the time of the offense. See note 35 of this opinion.

Of the 334 affected defendants, 4 were 14 years of age when they committed their first-degree-murder offenses, 44 were 15 years of age, 105 were 16 years of age, and 181 were 17 years of age. Of the 181 defendants who were 17 years of age at the time of their offenses, 28 were within two months of turning 18 years of age, with several of those individuals within days of turning 18. As for *when* the defendants were initially sentenced, 172 of the defendants were sentenced at least 20 years ago, with several sentenced as early as the mid- to late 1970s. Another 83 defendants were sentenced between 15 and 20 years ago, 46 were sentenced between 10 and 15 years ago, 33 were sentenced between 5 and 10 years ago, and none were sentenced within the last 5 years.

Ed 2d 256 (1989). *Saffle v Parks*, 494 US 484, 487; 110 S Ct 1257; 108 L Ed 2d 415 (1990). Generally speaking, a rule is "new" if the rule announces a principle of law not previously articulated or recognized by the courts and therefore "falls outside [the] universe of federal law" in place at the time defendant's conviction became final. *Williams v Taylor*, 529 US 362, 381; 120 S Ct 1495; 146 L Ed 2d 389 (2000) (opinion by Stevens, J.). If a rule is not deemed a "new rule," then the general rule of nonretroactivity is inapplicable and the rule will be applied retroactively even to cases that became final for purposes of direct appellate review before the case on which the defendant relies for the rule was decided. *Whorton v Bockting*, 549 US 406, 416; 127 S Ct 1173; 167 L Ed 2d 1 (2007). If, however, a rule is deemed a "new rule," then the general rule of nonretroactivity does apply. See *Saffle*, 494 US at 494

When a rule is deemed a "new rule" and the general rule of nonretroactivity applies, a court must then engage in *Teague*'s second inquiry, to wit, whether the "new rule" satisfies one of *Teague*'s two exceptions to the general rule of nonretroactivity for new rules. See *id*. If the "new rule" satisfies either of *Teague*'s two exceptions, then it will be applied retroactively. *Id*. If, however, the "new rule" fails to satisfy either of those exceptions, the rule will only be entitled to prospective application. *Id*. *Whorton* succinctly summarized *Teague*'s two exceptions to the general rule of nonretroactivity as follows:

> A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a " 'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." [*Whorton*, 549 US at 416, quoting *Saffle*, 494 US at 495, quoting *Teague*, 489 US at 311 (opinion by O'Connor, J.) (alteration in original).]

## 2.  "NEW RULE"

Turning to the first inquiry of the retroactivity analysis, whether the rule in *Miller* is "new," we note that the United States Supreme Court has defined a rule as "new" when the rule " 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not 'dictated by precedent existing at the time the defendant's conviction became final.' " *Saffle*, 494 US at 488, quoting *Teague*, 489 US at 301 (opinion by O'Connor, J.) (emphasis omitted).  Essential to any of these bases for finding that a rule is "new" is the question of whether "*all* reasonable jurists would have deemed themselves compelled to accept" the rule at the time defendant's conviction became final. *Graham v Collins*, 506 US 461, 477; 113 S Ct 892; 122 L Ed 2d 260 (1993) (emphasis added).  The fact that a "decision is within the 'logical compass' of an earlier decision . . . is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*."  *Butler v McKellar*, 494 US 407, 415; 110 S Ct 1212; 108 L Ed 2d 347 (1990).  In determining whether the rule in *Miller* is "new," this Court inquires whether before *Miller* courts of this state, if presented with a constitutional challenge to our pre-*Miller* sentencing statutes, would have felt bound to declare those statutes unconstitutional for the reasons expressed in *Miller*.

It is apparent, in our judgment, that the rule in *Miller* constitutes a new rule. *Miller* imposed a hitherto-absent obligation on state and lower federal courts to conduct individualized sentencing hearings before imposing a sentence of life without parole on a juvenile homicide offender.  As part of this process, a prosecutor seeking a life-without-parole sentence must now present evidence of aggravating factors relevant to the offender and the offense, juvenile defendants must be afforded the opportunity and the financial

24

resources to present evidence of mitigating factors relevant to the offender and the offense, psychological and other evaluations relevant to the youthfulness and maturity of the defendants must be allowed, and courts must now embark upon the consideration of aggravating and mitigating evidence offered regarding juvenile defendants as a condition to imposing sentences that previously required no such consideration. It thus seems certain as a result of *Miller* that a considerable number of juvenile defendants who would previously have been sentenced to life without parole for the commission of homicide offenses will have a lesser sentence meted out. Under *Teague* and *Saffle*, these new obligations clearly render the rule in *Miller* a new rule. We are not aware of any statement of this Court by any justice before *Miller* that argued in support of, or anticipated, the constitutional requirements set forth in that decision. Unless every affirmation by this Court of a sentence of life without parole on a juvenile offender before *Miller*, including those that followed decisions such as *Roper*, *Graham*, *Eddings*, and *Lockett*, can be characterized as "unreasonable," there cannot be serious argument that *Miller* did not define a "new rule."

Although *Miller* may be "within the logical compass" of earlier decisions, and built upon their foundation, cases predating *Miller* can hardly be read as having "dictated" or "compelled" *Miller*'s result. *Miller* undoubtedly broke new ground in that it set forth the first constitutional rule to mandate individualized sentencing before noncapital punishment can be imposed. In this respect, the capital-punishment cases, although providing a model for the form and effect of *Miller*, would not have required a

25

reasonable jurist to conclude that a life-without-parole sentence for a juvenile could only be constitutionally imposed following an individualized sentencing hearing.

Turning to the juvenile cases, *Roper* also dealt exclusively with the imposition of capital sentences without discussing the constitutionality of life-without-parole sentences and the need for individualized sentencing hearings. While *Graham*'s focus was on life-without-parole sentences, its constitutional rule was limited to nonhomicide offenses, and it did not make individualized sentencing the constitutional threshold for imposing a sentence of life without parole. Furthermore, while *Graham* drew a comparison between life-without-parole sentences for juvenile offenders and capital punishment, which was pivotal in deciding *Miller*, *Graham* also stopped well short of finding the two punishments equivalent. See *Graham*, 560 US at 69. This is evident by *Graham*'s reference to life without parole as " 'the second most severe penalty permitted by law,' " *id*., quoting *Harmelin v Michigan*, 501 US 957, 1001; 111 S Ct 2680; 115 L Ed 2d 836 (1991) (Kennedy, J., concurring in part), and its description of capital punishment as " '*unique* in its severity and irrevocability,' " *id*., quoting *Gregg*, 428 US at 187 (emphasis added). Accordingly, although *Roper* and *Graham* could certainly be argued as being part of a longer-term movement toward application of the individualized sentencing capital-punishment cases to life-without-parole sentences for juvenile homicide offenders, *Graham* itself nowhere compelled or dictated this application. Since before *Miller* a court of this state could have reasonably rejected a constitutional challenge to Michigan's pre-*Miller* sentencing scheme similar to that raised in *Miller*, *Miller* is clearly a "new rule."

26

## 3. PROCEDURE VERSUS SUBSTANCE

Concluding that *Miller* announced a new rule, we turn to the second inquiry, whether the rule in *Miller* fits within one of *Teague*'s two "narrow exceptions" to the general rule of nonretroactivity. *Saffle*, 494 US at 486. At the outset, we note that neither Carp nor Davis advanced any argument before this Court suggesting that *Miller* should be applied retroactively under the second exception, the "watershed rule of criminal procedure" exception. Accordingly, we consider any argument regarding *Miller* identifying a "watershed rule of criminal procedure" unpreserved, and we will only consider whether the rule in *Miller* fits within the first exception to the general rule of nonretroactivity.[10]

The first exception differentiates between new *substantive* rules and new *procedural* rules, allowing for the retroactive application of only the former. See *Whorton*, 549 US at 417; *Schriro v Summerlin*, 542 US 348, 351-352; 124 S Ct 2519; 159

---

[10] Nonetheless, we observe that

> [i]n order to qualify as watershed, a new rule must meet two requirements. First, the rule must be necessary to prevent an impermissibly large risk of an inaccurate conviction. Second, the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding. [*Whorton*, 549 US at 418 (citations and quotation marks omitted).]

In applying this standard, the *only* rule that the United States Supreme Court has ever identified as a "watershed rule" for purpose of *Teague*'s second exception is the rule drawn from *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963), which established that the Sixth Amendment included the right to appointed counsel at trial for indigent defendants. See *Whorton*, 549 US at 419. Furthermore, the sentencing rule in *Miller* has no possible effect in preventing any "impermissibly large risk of an inaccurate conviction" and pertains to no "bedrock procedural elements essential to the fairness of a proceeding."

L Ed 2d 442 (2004). The origin of the first exception predates *Teague*, as that decision drew the contours of this exception from Justice Harlan's partial concurrence and partial dissent in *Mackey v United States*, 401 US 667; 91 S Ct 1160; 28 L Ed 2d 404 (1971). *Teague*, 489 US at 311 (opinion by O'Connor, J.). In speaking of the "general" rule against retroactive application of new constitutional rules, Justice Harlan commented that the Court's

> discussion is written only with new 'procedural due process' rules in mind, that is, those applications of the Constitution that forbid the Government to utilize certain techniques or processes in enforcing concededly valid societal proscriptions on individual behavior. New 'substantive due process' rules, that is, those that place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, must, in my view, be placed on a different footing [and afforded retroactive application]. [*Mackey*, 401 US at 692 (Harlan, J., concurring in the judgments in part and dissenting in part).]

Justice Harlan supported this differentiation by emphasizing that retroactive application of a substantive rule "represents the clearest instance where finality interests should yield" because "[t]here is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose." *Id*. at 693. Contrasting the retroactive application of a substantive rule with that of a procedural rule, Justice Harlan proceeded to offer the observation that the retroactive application of a substantive rule "entails none of the adverse collateral consequences of retrial" certain to follow the retroactive application of a procedural rule. *Id*. This is because a substantive rule precludes the possibility of retrial given that its application dictates a *single result* for the class of individuals or type of conduct formerly regulated by the old rule and now

28

governed by the new rule. It is in this sense that categorical rules, such as those derived from the juvenile-sentencing strand of precedent, are substantive because they have a "form and effect" that *always* results in the imposed punishment being unconstitutional, i.e., they produce a "single result." Conversely, noncategorical rules, such as those derived from the capital-punishment strand of precedent-- and *Miller*-- are procedural because they have a "form and effect" that does *not* always result in the imposed punishment being unconstitutional, i.e., they do not produce a "single result." The latter rules merely require a court to perform a new or amended analysis before it can be determined whether a given punishment can be imposed on a particular defendant.

*Teague* subsequently adopted Justice Harlan's distinction between procedural and substantive rules, including the definition of when a rule is substantive. *Teague*, 489 US at 310-311 (opinion by O'Connor, J.). Since *Teague*, the United States Supreme Court has continued to recognize that the exceptions proposed by Justice Harlan in his opinion in *Mackey* were adopted in *Teague*. See, e.g., *Danforth v Minnesota*, 552 US 264, 273-275; 128 S Ct 1029; 169 L Ed 2d 859 (2008); *Penry*, 492 US at 329-330; see also *Schriro,* 542 US at 362 (Breyer, J., dissenting).

Although *Teague* addressed whether a new rule germane to the trial stage of a criminal case could be applied retroactively, later cases have addressed whether new rules pertaining only to punishments and the sentencing phase are substantive and fit into *Teague*'s first exception to the general rule of nonretroactivity. In so doing, the United States Supreme Court has provided three descriptions of what makes a new rule "substantive" within the context of a new rule governing the sentencing stage of a

29

criminal case. Each of these, however, can be boiled down to whether the punishment imposed is one that the state has the authority to, and may constitutionally, impose on an individual within the pertinent class of defendants.

First, a new rule has been described as "substantive" when the rule "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *Penry*, 492 US at 330; see also *Saffle*, 494 US at 494-495. Put another way, the new rule is "substantive" when the punishment at issue is categorically barred. The requirement that the new rule be "categorical" in its prohibition is the direct product of how Justice Harlan's first exception has been understood. That is, his first exception permits the retroactive application of "substantive categorical guarantees accorded by the Constitution, *regardless of the procedures followed*." *Penry*, 492 US at 329 (emphasis added); see also *Saffle*, 494 US at 494.

Second, a new rule has been described as "substantive" if it "alters the range of conduct or the class of persons that the law punishes." *Schriro*, 542 US at 353, citing *Bousley v United States*, 523 US 614, 620-621; 118 S Ct 1604; 140 L Ed 2d 828 (1998). The dissent contends that when a new rule "expand[s] the range of punishments" available to the sentencer, the rule fits within this second description of a new rule as substantive. *Post* at 19-20. Although a new rule could potentially be viewed as altering the range of punishments available to the sentencer when the rule makes a previously unavailable lesser punishment available to the sentencer, the United States Supreme Court has adopted a different definition for when a new rule "alters the range" of available punishments. We are bound to abide by that definition when considering the

30

rule in *Miller* for federal retroactivity purposes. Under that definition, a new rule alters the "range of conduct" that the law can punish when it "place[s] particular conduct or persons covered by the statute *beyond the State's power to punish*." *Schriro*, 542 US at 352 (emphasis added) (citations omitted). In this sense, the new rule transforms the conduct in which the defendant engaged, and which was previously within the state's power to regulate, into conduct that is no longer subject to criminal regulation. Applied in the context of rules governing sentencing and punishment, it must be the case that under the previous rule, the defendant "faces a punishment that the law cannot [any more] impose upon him" in light of the new rule. *Id.* In this sense, a new rule only "alters the range" of punishments available to the sentencer if it shifts the upper limits of the range of punishments downward so that the previously most severe punishment to which defendants have been sentenced is no longer a punishment that the sentencer may constitutionally impose.[11]

Third, a new rule has been described as "substantive" when it "narrow[s] the scope of a criminal statute *by interpreting its terms . . . .*" *Id.* at 351, citing *Bousley*, 523 US at 620-621 (emphasis added). This third description addresses situations in which a criminal statute has previously been interpreted and applied beyond the statute's intended

_____

[11] Although the dissent argues that *Schriro*'s definition of a rule that alters the range of punishments is "inclusive and not exclusive," *post* at 20 n 68, the dissent fails to identify a single Supreme Court decision that classifies a rule as "altering the range" of punishments when the rule requires the sentencer to *consider* a lesser punishment, but does not *exclude* any punishment from the range of punishments that may be considered. Despite no such decision, the dissent would make retroactive a type of rule that the Supreme Court has never before granted retroactive status under *Teague*'s first exception to the general rule of nonretroactivity.

31

scope so that the "defendant stands convicted of 'an act that the law does not make criminal.' " *Bousley*, 523 US at 620, quoting *Davis v United States*, 417 US 333, 346; 94 S Ct 2298; 41 L Ed 2d 109 (1974).[12]  Put another way, this description is implicated when a court, rather than a legislature, has criminalized conduct, authorized punishment, or construed a statute to apply more broadly than it is later deemed to apply.  See *id*. at 620-621 ("For under our federal system it is only Congress, and not the courts, which can make conduct criminal.").  In this sense, the state cannot constitutionally impose the punishment at issue because the new rule determines that no lawfully enacted statute has given the state the authority to impose such a punishment.

In distinguishing what makes a new rule substantive, the United States Supreme Court has also afforded considerable direction regarding the qualities and contours of nonsubstantive, or procedural, rules.  Simply put, "rules that regulate only the *manner of determining* the defendant's culpability are procedural." *Schriro*, 542 US at 353.  This is because a rule that alters the "manner of determining" culpability "merely raise[s] the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Id*. at 352.  Applying this understanding to new rules governing sentences and punishments, a new procedural rule creates the possibility that the defendant would have received a less severe punishment but does not necessitate such a result.  Accordingly, a rule is procedural when it affects how and under what framework

---

[12] Notable to the scope and application of this third description, both *Bousley* and *Davis* involved collateral attacks to federal criminal convictions in which such attacks were dependent on the interpretation of federal law, rather than the development of a new constitutional rule.

a punishment may be imposed but leaves intact the state's fundamental legal authority to seek the imposition of the punishment on a defendant currently subject to the punishment.

Turning to how the United States Supreme Court has applied this distinction between substantive and procedural rules, in *Schriro* the Court was confronted with whether the new rule from *Ring v Arizona*, 536 US 584; 122 S Ct 2428; 153 L Ed 2d 556 (2002), was substantive or procedural. *Ring*'s rule invalidated Arizona's capital-punishment sentencing scheme and required that a jury rather than a judge make the determination whether aggravating factors necessary for the imposition of capital punishment had been proved. *Id*. at 609. Despite the fact that *Ring* invalidated Arizona's statutory sentencing scheme authorizing capital punishment, *its* rule was ultimately deemed "procedural" on the basis that it

> did not alter the range of conduct Arizona law subjected to the death penalty. . . . Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts. [*Schriro*, 542 US at 353.]

In *Saffle*, the Court similarly deemed a new rule "procedural" when it would have prohibited anti-sympathy instructions to juries performing the individualized sentencing process as a condition to imposing capital punishment. See *Saffle*, 494 US at 486. In doing so, *Saffle* stated that the rule "would neither decriminalize a class of conduct nor prohibit the imposition of capital punishment on a particular class of persons." *Id*. at 495. It is with *Schriro* and *Saffle* in mind that we turn to the question of whether the rule in *Miller* is properly viewed as substantive or procedural.

Although the new procedures required by *Miller* may be more elaborate and detailed than the new procedures at issue in *Schriro* and *Saffle*, the basic form and effect is the same. As discussed earlier, *Miller* requires that the trial court "follow a certain process" before it can impose a sentence of life without parole on a juvenile homicide offender. *Miller*, 567 US at ___; 132 S Ct at 2471. *Miller*, however, specifically "does not categorically bar a penalty for a class of offenders or type of crime[.]" *Id*. at ___; 132 S Ct at 2471.

Considering *Miller*'s self-description of its rule, it is clear that the rule is not substantive within the terms of the first description of when a rule is substantive, i.e., when the rule "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *Penry*, 492 US at 330; see also *Saffle*, 494 US at 494. The *category* of punishment implicated by *Miller* is a sentence of "life without parole,"[13] the *class* of defendants receiving the benefit of *Miller* are juvenile defendants who are under the age of 18 at the time they commit their offenses, and the *types* of offenses implicated by *Miller* are homicide offenses. Accordingly, for *Miller* to be considered "substantive" under the first description of when a rule is substantive, it must prohibit sentences of life without parole for juvenile offenders under the age of 18 who are

---

[13] Carp and Davis argue that the sentence imposed on them was a sentence of "mandatory" life without parole. Regardless of the process by which a defendant is sentenced to life without parole, however, the term that the defendant serves is simply life without parole. Had, for instance, Carp and Davis received all the procedural protections afforded by *Miller* before being sentenced, the terms they would serve in prison would be identical. The specific *manner* in which a defendant is sentenced, i.e., by operation of law or as a result of individualized sentencing, does not alter the actual sentence rendered or the length of time the defendant must remain in prison.

convicted of homicide offenses, and clearly *Miller* does no such thing. Instead, as with the procedural rules in *Schriro* and *Saffle*, and the rules from the capital-punishment cases of *Woodson*, *Lockett*, and *Eddings*, *Miller* creates only the *possibility* that a defendant may have received a lesser punishment had the trial court employed the new process that is constitutionally required by *Miller*.

The second description of when a rule is substantive is equally of no avail to Carp and Davis because a rule is substantive under that description only when it alters the range of punishments that a state is permitted to impose by foreclosing the state's ability to impose the punishment defendant is serving. See *Schriro*, 542 US at 353. In this sense, a rule is only substantive if it acts to ratchet down the previously most severe punishment possible. Conversely, and contrary to the dissent, a rule will be considered procedural if it merely *expands* the range of possible punishments that may be imposed on the defendant. Applied to Michigan's sentencing scheme, *Miller* now requires the sentencer to consider imposing a sentence of life with the possibility of parole, but it does not require the sentencer to exclude from consideration a sentence of life without parole. Accordingly, *Miller* does not remove the punishment imposed on Carp and Davis from within the range of punishments the state has the power to impose. Accordingly, the rule in *Miller* again cannot be viewed as substantive under the second United States Supreme Court description.

The third description of when a rule is substantive is altogether inapplicable to *Miller*. The decision did not rest on any principle of statutory interpretation, and it did not pertain to a situation in which life-without-parole sentences were being imposed on

juvenile homicide offenders absent clear statutory authority to do so. Just as Carp and Davis were sentenced to life without parole in full accordance with Michigan's statutory sentencing scheme, Miller was sentenced to life without parole in full accordance with Alabama's statutory sentencing scheme. See *Miller*, 567 US at ___; 132 S Ct at 2462-2643.

Ultimately, the rule in *Miller* is procedural because, as with the rule in *Ring*, it merely shifts "decisionmaking authority" for the imposition of a life-without-parole sentence on a juvenile homicide offender.[14] *Schriro*, 542 US at 353. Whereas *Ring* shifted decision-making authority for imposing capital punishment from the judge to the jury, *Miller* shifted decision-making authority for imposing a sentence of life without parole on a juvenile homicide offender from the legislature to the judiciary, by way of its individualized sentencing requirements.[15] Although the process set forth in *Miller* is

---

[14] The dissent asserts that the rule in *Miller*, although having "procedural implications," is nonetheless substantive because it invalidated "*an entire 'sentencing scheme.'* " *Post* at 13-14. While the dissent is correct that *Miller* invalidated Michigan's sentencing scheme authorizing the imposition of a life-without-parole sentence for a juvenile homicide offender, *Ring* also invalidated Arizona's sentencing scheme authorizing the imposition of capital punishment on a homicide offender. As *Ring* was deemed procedural, it follows that the distinction between substantive and procedural rules does not turn on whether the new rule invalidates a sentencing scheme authorizing a punishment. Instead, the distinction turns on whether the punishment is one that the state may constitutionally impose under any conceivable sentencing scheme governing the class of defendants to which the defendant belongs.

[15] The dissent argues that while a shift in decision-making authority from a judge to a jury is procedural, a shift in decision-making authority from the legislature to the judiciary is substantive because it vests new authority (the authority to impose a lesser sentence) in the judiciary. *Post* at 18-20. Although we acknowledge that there is a difference between these respective shifts in decision-making authority, we do not find the difference pivotal in determining whether a new rule is substantive or procedural.

undoubtedly more favorable to juvenile homicide defendants as a class, the new process

has no effect on Michigan's inherent authority to lawfully and constitutionally seek the

imposition of a life-without-parole sentence on any and every given juvenile homicide

offender. Just as no court may impose a sentence of life without parole without

conducting an individualized consideration of certain factors, no court relying on *Miller*

may categorically refuse to impose a sentence of life without parole if the individualized

sentencing factors do not operate in a defendant's favor. Accordingly, in contrast to a

substantive rule that avoids the adverse collateral consequences of retrial by dictating a

singular result, *Mackey*, 401 US at 693 (Harlan, J., concurring in the judgments in part

and dissenting in part), retroactive application of *Miller* necessarily requires this adverse

collateral consequence. In this regard, the rule in *Miller* in no reasonable way can be said

to "represent[] the *clearest* instance where finality interests should yield." *Id*. (emphasis

added). Because *Miller* continues to permit Michigan to impose a life-without-parole

sentence on any juvenile homicide offender (but only after individualized consideration),

it must necessarily be viewed as procedural rather than substantive. Therefore, we hold

---

This is because the question at hand is not focused on whether the *judiciary's* or the *legislature's* or the *executive's* authority has changed as a function of the new rule, but inquires only whether the punishment imposed is one that is beyond the *state's* or the *law's* power to impose. *Schriro*, 542 US at 352 (defining a rule as substantive when it "place[s] particular conduct or persons covered by the statute beyond the *State's* power to punish" or means that the defendant "faces a punishment that the *law* cannot [any more] impose upon him") (emphasis added). Both before and after *Miller* the state of Michigan possessed the authority to constitutionally impose a sentence of life without parole on a juvenile homicide offender.

that the rule in *Miller* does not satisfy the first exception to the general rule of nonretroactivity in *Teague*.

An additional consideration serves to strengthen this conclusion. In its description of the rule in *Miller,* the articulation employed by the United States Supreme Court is telling. *Teague*'s retroactivity analysis distinguishing substantive and procedural rules is in no sense new or novel. Rather, the proposition that "substantive *categorical* guarantees" should receive retroactive application while "procedural *noncategorical* guarantees" should only receive prospective application predates *Teague*. See *Penry*, 492 US at 329. In the face of this reasonably well-defined and longstanding distinction, *Miller*, in describing the nature and scope of its rule, repeatedly employs language typically associated with nonretroactive procedural rules. Although fully recognizing that *Roper* and *Graham* announced "categorical" bars, *Miller* twice states that its rule does *not* create a "categorical" bar. *Miller*, 567 US at ___; 132 S Ct at 2469, 2471. Furthermore, *Miller*, in straightforward terms, speaks of its rule as one that "mandates only that a sentencer follow a *certain process*[.]" *Id*. at ___; 132 S Ct at 2471 (emphasis added). It is hard to view these statements as anything other than expressions of continuity in the Court's understanding of the law of retroactivity, particularly in a circumstance in which the four justices of the Supreme Court who were presumably the *least* inclined to extend *Miller* to a broader range of cases-- the dissenting justices who had rejected the new rule in the first place-- were absent from the majority opinion.[16]

---

[16] One of the critical divides between how this majority resolves the question of *Miller*'s retroactivity and how the dissent resolves the same question centers on the significance each accords to the words the Supreme Court chose to use in describing the rule in

Carp advances three arguments in an effort to overcome our conclusion that *Miller* does not qualify for retroactive application under *Teague*. First, he argues that each of the strands of precedent that underlie *Miller* has been granted retroactive status. While there may be considerable force to the argument that categorical rules like those in *Roper* and *Graham* must be applied retroactively under *Teague*, the same cannot be said for the strand of cases requiring individualized sentencing before capital punishment can be imposed on an adult offender. Despite considerable effort by Carp, including post-oral-argument supplemental briefings, we remain unpersuaded that the United States Supreme Court, or even any federal court of appeals,[17] has declared any of the individualized sentencing capital-punishment cases retroactive under *Teague*.

---

*Miller*. Despite its many thoughtful arguments, the dissent is unable to explain why the Supreme Court, if it genuinely intended for the rule in *Miller* to be applied retroactively under *Teague*, specifically stated that the rule in *Miller* does not "categorically bar a penalty," *Miller*, 567 US at ___; 132 S Ct at 2471, when the "categorical bar" versus "noncategorical bar" distinction defines the critical element of the retroactivity analysis in *Teague*. The dissent contends that by focusing on "categorical" versus "noncategorical" distinction, the majority "muddles" the *Teague* analysis. *Post* at 14. However, it is the dissent that misapprehends *Teague* by its conclusion that the rule in *Miller* is entitled to retroactive relief despite its acknowledgement that *Miller* did not categorically bar life-without-parole sentences for juveniles. *Id*. Neither defendants nor the dissent has identified a single Supreme Court decision that has ever concluded that a noncategorical rule is entitled retroactive application under the first of *Teague*'s two exceptions to the general rule of nonretroactivity. From this, we can only reason that *Teague* does not merely stand for the proposition, as the dissent asserts, that a categorical rule is substantive, but also for the proposition that a rule is substantive only when it is categorical.

[17] We include federal courts of appeal in our discussion because Carp cites federal courts of appeal decisions for the proposition that the capital-punishment strand of precedent has been applied retroactively.

In an effort to demonstrate to the contrary, Carp principally cites *Sumner*, in which the United States Supreme Court held that individualized sentencing was required before capital punishment could be imposed on a defendant, Shuman, who was serving a life-without-parole sentence at the time he committed the capital offense. *Sumner*, 483 US at 80-81. Carp is correct that *Sumner* relied on *Woodson* in creating its rule, *id*. at 70-75, and is also correct that *Sumner* involved the review of a state conviction on collateral habeas review, see *id*. at 68. However, not all cases presenting themselves on collateral review are equivalent for retroactivity purposes. Some cases on collateral review assert that state courts failed to properly apply constitutional rules in effect before the defendant's conviction became final, while others seek the application or creation of a new rule that was not announced before the defendant's conviction became final.

If, with respect to the application of *Woodson*, *Sumner* fell into the latter category, then we might agree with Carp that *Woodson* had been applied retroactively. *Sumner*, as it relates to the application of *Woodson*, however, falls into the former category of cases presenting themselves on collateral review. *Woodson* was decided on July 2, 1976, and Shuman's conviction did not become final for direct review purposes until May 17, 1978, nearly two years after *Woodson* was decided. See *Shuman v State*, 94 Nev 265; 578 P2d 1183 (1978). Accordingly, to the extent that *Woodson* was applied in *Sumner*, it was simply not applied retroactively to a case that had become final for direct review purposes before *Woodson* was issued.[18]

---

[18] We further note that even if *Sumner* had applied *Woodson* retroactively to a case that had become final for direct review purposes before *Woodson* was announced, it still would not follow that *Woodson* qualified for retroactive application under *Teague*. This

Apparently anticipating these flaws in the argument that *Woodson* has been applied retroactively, Carp contends that *Sumner* itself has been applied retroactively post-*Teague*. For this proposition, he cites *Thigpen v Thigpen*, 926 F2d 1003, 1005 (CA 11, 1991). We, however, do not read *Thigpen* as addressing the question of *Sumner*'s retroactivity. Although the district court below had applied *Sumner* retroactively to invalidate Thigpen's sentence, that portion of the district court's ruling was never appealed and the only issue before the United States Court of Appeals for the Eleventh Circuit was Thigpen's appeal concerning whether the district court had erred by upholding his conviction. See *id*.[19]

Accordingly, Carp has not succeeded in demonstrating that any of the individualized sentencing capital-punishment cases, i.e., *Furman*, *Woodson*, *Lockett*,

---

is because *Sumner* was decided in 1987 and *Teague*, in which a plurality of the United States Supreme Court announced the current federal retroactivity test, was not decided until 1989. It is for this same reason that we reject Carp's contention that the retroactive application of *Lockett*'s rule in *Songer v Wainwright*, 769 F2d 1488, 1489 (CA 11, 1985), and *Dutton v Brown*, 812 F2d 593, 599 n 7 (CA 10, 1987), carries any weight with regard to whether those courts applying *Lockett* retroactively would have done so under *Teague*. The same can also be said about the significance of the retroactive application of the rule from *Furman* as acknowledged in *Michigan v Payne*, 412 US 47, 57 n 14; 93 S Ct 1966; 36 L Ed 2d 736 (1973).

[19] In framing the issue before the court, the Eleventh Circuit stated:

> On appeal, Thigpen raises only one issue: whether the admission of evidence that he was convicted in 1972 of another first-degree murder and received a death sentence . . . rendered his trial so fundamentally unfair that he was convicted without the due process of law. For the reasons set forth below, we affirm the district court's conclusion that Thigpen's conviction was constitutional. [*Thigpen*, 926 F2d at 1005.]

41

*Eddings*, or *Sumner*, have been applied retroactively under *Teague*. This failure is pivotal given our earlier conclusion that the rule in *Miller* is of the same form and effect as the rules in the individualized sentencing capital-punishment cases.

Second, Carp argues that *Miller* has added "age" and "incorrigibility" as elements of what must be assessed before a life-without-parole sentence can be imposed on a juvenile offender. Carp argues that it follows from this that age and the juvenile offender's incorrigibility are aggravating factors that raise the mandatory minimum sentence that a defendant could receive under Michigan's pre-*Miller* sentencing scheme because they must now be shown by the state before a juvenile offender can be sentenced pursuant to MCL 750.316(1) and MCL 791.234(6). Citing *Alleyne v United States*, 570 US ___; 133 S Ct 2151, 2155; 186 L Ed 2d 314 (2013), Carp notes that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." Accordingly, he argues that the rule in *Miller* must be viewed as substantive and applied retroactively when it is considered in light of *Alleyne* because *Miller* combined with *Alleyne* substantively alters the way Michigan law defines and sentences juvenile homicide offenders.

Even assuming for the sake of argument that *Miller* made assessments of "age" and "incorrigibility" necessary elements for imposing a life-without-parole sentence on a juvenile homicide offender, Carp's argument still fails.[20] This is because his argument

---

[20] Because Carp's argument fails here, we find it unnecessary to address whether *Miller* adds the elements of age and incorrigibility to what must be found before a life-without-parole sentence may be imposed on a juvenile homicide offender. We do note that *Miller*'s repeated statements that individualized sentencing hearings could occur before a "*judge* or jury," *Miller*, 567 US at ___; 132 S Ct at 2460, 2470, 2475, tend to suggest that

relies on the new rule adopted in *Alleyne* and therefore *Alleyne* itself would need to qualify for retroactive application to have any bearing on the instant case. Carp, however, has failed to even argue, much less persuade this Court, that *Alleyne* established a substantive rule entitled to retroactive application under *Teague*. Absent being so persuaded, we treat the rule in *Alleyne* as a procedural rule entitled only to prospective application.[21] Accordingly, to the extent that we view *Alleyne* as establishing a nonretroactive procedural rule, *Alleyne* may not be bootstrapped onto the rule in *Miller* to transform the latter from a nonretroactive procedural rule into a retroactive substantive rule.

---

*Miller* did not make age or incorrigibility aggravating elements because under *Alleyne* aggravating elements that raise the mandatory minimum sentence "must be submitted to the *jury* and found beyond a reasonable doubt," *Alleyne*, 570 US at ___; 133 S Ct at 2155. (Emphasis added.) However, because *Alleyne* was decided after *Miller*, *Miller*'s reference to individualized sentencing being performed by a "*judge* or jury" might merely be instructive on the issue but not dispositive. As none of the defendants before this Court asserts that his sentence is deficient because it was not the product of a jury determination, we find it unnecessary to further opine on this issue and leave it to another day to determine whether the individualized sentencing procedures required by *Miller* must be performed by a jury in light of *Alleyne*.

[21] Treating *Alleyne* as a procedural rule is consistent with how multiple federal courts have resolved the issue of whether *Alleyne* is procedural or substantive for federal retroactivity purposes. See, e.g., *Simpson v United States*, 721 F3d 875, 876 (CA 7, 2013) (comparing *Alleyne* to the rule from *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), which has been held to be procedural); *United States v Evans*, ___ F Supp 2d ___ (WD Ark, February 25, 2014, Case Nos. 1:11-CR-10012 and 1:13-CV-1025), citing *United States v Lara-Ruiz*, 721 F3d 554, 557 (CA 8, 2013); *Willoughby v United States*, ___ F Supp 2d ___ (WD NC, September 17, 2013, Case Nos. 3:13-CV-493-FDW and 3:99-CR-24-FDW-6).

Third, Carp cites *Miller*'s companion case of *Jackson v Hobbs* as evidence that *Miller* has *already* been accorded retroactive status, and therefore presumably that the present judicial exercise has been rendered unnecessary. In offering this argument, Carp is correct that *Jackson* presented itself on collateral review and that the case was remanded for resentencing pursuant to the rule announced in *Miller*. *Miller*, 567 US at ___; 132 S Ct at 2475. Accordingly, Carp also correctly notes that Jackson received retroactive relief under *Miller*. *Id*. at ___; 132 S Ct at 2475. That being said, the fact that Jackson received the benefit of *Miller* being applied retroactively does not lead to the conclusion that *Miller* must be applied retroactively to any other defendant. This is because the assertion that a rule is nonretroactive is an "affirmative defense," available to a prosecutor in *objection* to collateral relief being sought by a defendant. *Thompson v Runnels*, 705 F3d 1089, 1099 (CA 9, 2013) (noting that *Caspari v Bohlen*, 510 US 383, 389; 114 S Ct 948; 127 L Ed 2d 236 (1994) held that " 'a federal court may, but need not, decline to apply *Teague* if the State does not argue it,' but 'if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court must apply *Teague* before considering the merits of the claim' "). As such, the nonretroactivity argument must be affirmatively raised by the state and when it is not raised, it is waived:

> Since a State can waive the *Teague* bar by not raising it, and since the propriety of reaching the merits of a dispute is an important consideration in deciding whether or not to grant certiorari, the State's omission of any *Teague* defense at the petition stage is significant. Although we undoubtedly have the discretion to reach the State's *Teague* argument, we will not do so in these circumstances. [*Schiro v Farley*, 510 US 222, 229; 114 S Ct 783; 127 L Ed 2d 47 (1994) (citation omitted).]

44

In this sense, a defense premised on the nonretroactivity of a new rule is "not 'jurisdictional' " in nature, and the court does not have any duty sua sponte to conduct a retroactivity analysis. *Collins v Youngblood*, 497 US 37, 41; 110 S Ct 2715; 111 L Ed 2d 30 (1990). Rather, because the question of retroactivity is "grounded in important considerations of federal-state relations," a state is free to "[choose] not to rely on *Teague*" without the federal courts' invalidating that choice. *Id*. By opting not to raise the defense in *Jackson*, the defense was waived and the question whether *Miller* should be applied retroactively was never presented to the United States Supreme Court.[22]

Carp, however, contends that "principles of even-handed justice" dictate that the rule in *Miller* be applied retroactively in his case since it was applied retroactively in Jackson's case. He draws his argument from *Teague*, wherein the United States Supreme Court stated:

> We can simply refuse to announce a new rule in a given case unless the rule would be applied retroactively to the defendant in the case and to all others similarly situated. . . . We think this approach is a sound one. Not only does it eliminate any problems of rendering advisory opinions, it also avoids the inequity resulting from the uneven application of new rules to similarly situated defendants. We therefore hold that, *implicit in the retroactivity approach we adopt today*, is the principle that *habeas corpus cannot be used* as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review . . . . [*Teague*, 489 US at 316 (opinion by O'Connor, J.) (all but last emphasis added).]

---

[22] Tellingly, with regard to the prosecutor's intentions in *Jackson*, we further note that on remand the prosecutor conceded the defense of retroactivity, but did so only on the basis "*that Jackson* is entitled to the benefit of the United [States] Supreme Court's opinion *in his own case*." See *Jackson v Norris*, 2013 Ark 175, p 6; 426 SW3d 906 (2013) (emphasis added).

45

As evidenced by the very quotation on which Carp relies, the application of the "principles of even-handed justice" only become relevant when the United States Supreme Court has actually *undertaken* a retroactivity analysis in the course of announcing a new rule. If no such analysis is necessary *because of the posture of the case*, as here, the Court will obviously not have the occasion to consider whether the new rule can be applied retroactively to all defendants who are situated similarly to the defendant before the Court.[23] Under those circumstances, the idiosyncrasies, strategies, or policies and practices of a single prosecutor, among more than 3,000 throughout the country, cannot possibly be allowed under our system of federalism to determine what "even-handed justice" requires (and what the law does or does not command) of all prosecutors in every jurisdiction throughout the country.[24]

---

[23] The dissent similarly acknowledges that the Supreme Court's application of the rule in *Miller* to Jackson is "inconclusive" about whether the rule should be applied retroactively and that the relief Jackson received does not mandate the retroactive application of *Miller* to any other case. *Post* at 8 n 31.

[24] Although the issue was not raised in any way by any of the defendants, the dissent argues that *Miller* is similar to *Atkins v Virginia*, 536 US 304; 122 S Ct 2242; 153 L Ed 2d 335 (2002), because "considerable discretion" is left to the states by both rules, so that where *Atkins* has been applied retroactively, so too should *Miller*. *Post* at 22-23. While the dissent is not incorrect to suggest that *Miller* and *Atkins* both allow some discretion to the states, it fails to examine this issue with greater precision. *Atkins* held that the Eighth Amendment bars the imposition of capital punishment on a "mentally retarded offender." *Atkins*, 536 US at 321. *Atkins*, however, left it to the discretion of the states to establish criteria for whether a defendant qualifies as "mentally retarded." *Id*. at 317. Accordingly, the discretion left to the states by *Atkins* pertains to when *Atkins* applies and which defendants fall within the universe of defendants governed by *Atkins*. Once a defendant is deemed to be mentally retarded, however, the state's discretion ceases and *Atkins* compels the *single* result that the state is constitutionally prohibited from imposing capital punishment on the defendant. Under *Miller*, by contrast, all juveniles are entitled to individualized sentencing hearings and accordingly the state has no discretion to

Having concluded that *Miller* established a new procedural rule that does not "categorically bar a penalty," but instead requires "only that a sentencer follow a certain process," *Miller*, 567 US at ___; 132 S Ct at 2471, and having rejected the arguments in support of the retroactive application of *Miller*, we hold that the United States Supreme Court's decision in that case does not require retroactive application under *Teague*. In light of this holding, we now turn to whether *Miller* is entitled to retroactive application under Michigan's separate test for retroactivity.

## C. STATE RETROACTIVITY

Although states must apply a new rule of criminal procedure retroactively when the new rule satisfies *Teague*'s exceptions to the general rule of nonretroactivity, they are permitted to "give broader retroactive effect" to a new rule than is required by *Teague*. *Danforth*, 552 US at 288-289. In this sense, *Teague* provides a floor for when a new rule of criminal procedure must be applied retroactively, with a state nonetheless free to adopt

---

determine when, and to which defendants, *Miller* applies. Instead, the discretionary element of *Miller* only comes into play in selecting a sentence for a defendant after it has been determined, per *Miller*, that the defendant is a juvenile by virtue of being under the age of 18 at the time of the offense. In this regard, the rules announced in *Atkins* and *Miller* have both different forms and different effects. That is, *Atkins* has the form of a categorical rule in that after a state has determined that a defendant is "mentally retarded," it applies to bar the imposition of capital punishment on that defendant, while *Miller* has the form of a noncategorical rule in that it requires individualized sentencing before a life-without-parole sentence may be imposed on a juvenile homicide offender but expressly does not bar the imposition of that sentence. Further, the effect of *Atkins* will always produce a *single* result in invalidating the capital sentence of every defendant who falls within the rule because the defendant is "mentally retarded," while the effect of *Miller* will necessarily result in the imposition of a variety of sentences for different offenders, creating only the potential that any given juvenile will receive a sentence other than life without parole.

47

its own broader test for requiring the retroactive application of a new federal or state constitutional rule. See *id.* at 289-290.

Michigan has adopted its own separate test for when a new rule of criminal procedure should be applied retroactively. See *Maxson*, 482 Mich at 392-393. Michigan's test for retroactivity was originally derived from the pre-*Teague* federal test set forth in *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965). See *People v Hampton*, 384 Mich 669, 674; 187 NW2d 404 (1971).

Despite Michigan's having adopted its own retroactivity test that may give broader retroactive effect to some new rules than is mandated by the *Teague* test, Michigan nonetheless still adheres to the general principle of nonretroactivity for new rules of criminal procedure.[25] As a result, "Michigan law has regularly declined to apply new rules of criminal procedure to cases in which a defendant's conviction has become final." *Maxson*, 482 Mich at 392-393 (citing several examples of new rules of criminal procedure that this Court declined to apply retroactively under its version of the

---

[25] Contrary to Carp's and Davis's assertions, and consistently with the general principle of nonretroactivity, this Court does not adhere to the doctrine that an unconstitutional statute is void *ab initio*. *People v Smith*, 405 Mich 418, 432-433; 275 NW2d 466 (1979). In rejecting this doctrine, this Court in *Smith*, 405 Mich at 432, cited *Lemon v Kurtzman*, 411 US 192; 93 S Ct 1463; 36 L Ed 2d 151 (1973), which, for federal retroactivity purposes, departed from the view that an unconstitutional statute is a nullity *ab initio*. *Smith* also quoted *Chicot Co Drainage Dist v Baxter State Bank*, 308 US 371; 60 S Ct 317; 84 L Ed 329 (1940), for the proposition that a new constitutional rule does not always nullify past application of the old rule when the old rule was understood to have conformed with the Constitution at the time it was applied: " 'The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.' " *Smith*, 405 Mich at 432, quoting *Chicot Co*, 308 US at 374.

*Linkletter* test).  With Michigan's predisposition against the retroactive application of new rules of criminal procedure firmly in mind-- in that only the extraordinary new rule of criminal procedure will be applied retroactively under Michigan's test when retroactivity is not already mandated under *Teague*-- we proceed to evaluate whether the rule in *Miller* satisfies this state test.

Michigan's test for retroactivity consists of three factors:

> "(1) the purpose of the new rule[]; (2) the general reliance on the old rule[;] and (3) the effect of retroactive application of the new rule on the administration of justice." [*Maxson*, 482 Mich at 393, quoting *Sexton*, 458 Mich at 60-61, citing *Hampton*, 384 Mich at 674 (second alteration in original).]

The first factor, the purpose factor, assesses the nature and focus of the new rule and the effect the rule is designed to have on the implementation of justice.  See *People v Young*, 410 Mich 363, 366-367; 301 NW2d 803 (1981).  Under this first factor, when a new rule "concerns the ascertainment of *guilt* or *innocence*, retroactive application may be appropriate."  *Id*. at 367, citing *Hampton*, 384 Mich 669 (emphasis added).  Conversely, "[w]hen the ascertainment of guilt or innocence is not at stake, prospective application is possible" because "the purposes of the rule can be effectuated by prospective application."  *People v Markham*, 397 Mich 530, 535; 245 NW2d 41 (1976).  Consistent with this standard for when a rule should be applied only prospectively, "a new rule of procedure . . . which does not affect the integrity of the fact-finding process should be given [only] prospective effect."  *Young*, 410 Mich at 367.

Carp contends that *Miller*, although not implicating his guilt or innocence, nonetheless, goes to the "integrity of the fact-finding process" because it is essential to

evaluating a defendant's level of culpability when imposing a sentence.  In support of this contention, he cites *McConnell v Rhay*, 393 US 2, 3-4; 89 S Ct 32; 21 L Ed 2d 2 (1968), in which pursuant to *Linkletter*, the United States Supreme Court retroactively applied a new rule of criminal procedure despite the new rule's being relevant only to the sentencing phase.[26]  As Carp correctly observes, *McConnell*, in effecting its proretroactivity holding, stated that "the right being asserted relates to 'the very integrity of the fact-finding process.' " *Id*. at 3, quoting *Linkletter*, 381 US at 639.

Two considerations, however, leave us unpersuaded that this remark necessitates the conclusion that the first factor of Michigan's test favors the retroactive application of *Miller*.  First, the new rule applied retroactively in *McConnell* addressed the right to counsel, a right with unique significance both within the context of the criminal proceeding[27] and within the context of the United States Supreme Court's retroactivity jurisprudence.[28]  Given this extraordinary footing of the right to counsel, we read

---

[26] The new rule made retroactive in *McConnell* was set forth in *Mempa v Rhay*, 389 US 128; 88 S Ct 254; 19 L Ed 2d 336 (1967), and held that the Sixth Amendment right to counsel, including the appointment of counsel for indigent defendants, extended to the sentencing phase of a criminal trial. *McConnell*, 393 US at 2-3.

[27] The Sixth Amendment right to counsel has been described as a right "necessary to insure fundamental human rights of life and liberty" with "[t]he Sixth Amendment stand[ing] as a constant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.' " *Johnson v Zerbst*, 304 US 458, 462; 58 S Ct 1019; 82 L Ed 1461 (1938), citing *Palko v Connecticut*, 302 US 319, 325; 58 S Ct 149; 82 L Ed 288 (1937).  In *Gideon*, 372 US at 344, the Sixth Amendment right to counsel was described as "fundamental and essential to fair trials," such that indigent criminal defendants facing felony charges are entitled to the appointment of counsel.

[28] As *McConnell* noted, rules extending "a criminal defendant's right to counsel at trial, *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) ; at certain arraignments, *Hamilton* v.

50

*McConnell*'s statement that "the *right* being asserted relates to 'the very integrity of the fact-finding process' " as concerning specifically the *right* to counsel rather than all new rules that may expand the fact-finding process at sentencing. For this reason, we do not understand *McConnell* as necessitating the view that, for retroactivity purposes under the *Linkletter* test, rules implicating the fact-finding process at sentencing must be placed on equal footing with rules implicating the fact-finding process for guilt or innocence.

Second, even if *McConnell* supported the expansive view that Carp attributes to it, that view is contrary to how Michigan law describes its *own* application of the *Linkletter* test. In every case to date in which this Court has applied the state retroactivity test, the "integrity of the fact-finding process" has always been referred to in the context of determining a defendant's "guilt or innocence." *Maxson*, 482 Mich at 393-394; *Sexton*, 458 Mich at 62; *Young*, 410 Mich at 367. To the extent that *McConnell* may have viewed the "fact-finding process" as continuing throughout sentencing, we respectfully disagree and decline to adopt such an expansive view for purposes of our separate and independent test for retroactivity. It reflects an understanding of retroactivity that is no longer subscribed to by the United States Supreme Court and an understanding to which this Court has never subscribed. There is utterly no obligation on our part to forever maintain the *Linkletter* test in accordance with every past federal understanding when the

*Alabama*, 368 U. S. 52 [82 S Ct 157; 7 L Ed 2d 114] (1961) ; and on appeal, *Douglas* v. *California*, 372 U. S. 353 [83 S Ct 814; 9 L Ed 2d 811] (1963), have all been applied retroactively." *McConnell*, 393 US at 3. In fact, the right to counsel is such a uniquely fundamental right that *Gideon* remains "the only case that [the United States Supreme Court has] identified as qualifying under the [watershed rule of criminal procedure exception to nonretroactivity from *Teague*]." *Whorton*, 549 US at 419.

51

test is now defunct for federal purposes and this Court, although initially relying on *Linkletter* to formulate our state test for retroactivity, has added its own interpretations to that test. Instead, the general principle of nonretroactivity for new rules of criminal procedure, to which Michigan adheres and which informs this state's retroactivity analysis, is properly served, in our judgment, by applying retroactively only those new rules of procedure that implicate the guilt or innocence of a defendant. We acknowledge that there are circumstances in which our state test may sometimes apply a new rule retroactively in circumstances in which *Teague* would not apply, but we are not prepared to extend our test beyond the federal test to the degree urged upon us by Carp.

In declining to expand the scope of the first factor of Michigan's state test for retroactivity, we note again that although our state test is derived from *Linkletter*, nothing requires this Court to adopt each and every articulation of that test-- one that is no longer adhered to by the United States Supreme Court itself. Our state test for retroactivity is supplemental to the current federal test set forth in *Teague*, and it is separate and independent of the former federal test set forth in *Linkletter*. See *Danforth*, 552 US at 289. As the *Teague* test replaced the *Linkletter* test for federal purposes, doubtlessly contracting the universe of new constitutional rules that will be applied retroactively,[29] it

---

[29] See *Sawyer v Smith*, 497 US 227, 257-258; 110 S Ct 2822; 111 L Ed 2d 193 (1990) (Marshall, J., dissenting) ("The Court's refusal to allow Sawyer the benefit of *Caldwell* [*v Mississippi*, 472 US 320; 105 S Ct 2633; 86 L Ed 2d 231 (1985)] reveals the extent to which *Teague* and its progeny unjustifiably limit the retroactive application of accuracy-enhancing criminal rules. Prior to *Teague*, our retroactivity jurisprudence always recognized a difference between rules aimed primarily at deterring police conduct and those designed to promote the accuracy of criminal proceedings.").

should be unsurprising that this Court would decline to grant retroactive status to a new rule of criminal procedure affecting only the sentencing phase of a criminal case when such a permutation of the defunct test has never before been so applied in this state.[30]

From our holding that the first factor of our state test for retroactivity focuses on whether a new rule of procedure implicates a defendant's guilt or innocence, it is apparent that the first factor clearly militates against the retroactive application of *Miller*. As *Miller* alters only the process by which a court must determine a defendant's level of moral culpability for purposes of *sentencing*, it has no bearing on the defendant's legal culpability for the offense of which the defendant has been duly convicted.

In light then of our conclusion that the first state factor clearly counsels against the retroactive application of *Miller*, we find it relevant here to address the interplay between the three factors of the test and the weight that must be given to each before we determine the effect of the second and third factors on *Miller*'s retroactive application. That a test consists of multiple factors does not logically signify that equal weight must be given to

---

[30] We recognize that the prosecutor in *Davis* and the Attorney General as an intervenor in *Carp* both assert that this Court should abandon Michigan's separate test for retroactivity and adopt *Teague* as our state test. We further recognize the anomalousness of this Court applying new federal rules retroactively pursuant to a standard that is more expansive than that which the United States Supreme Court has directed be applied by federal courts themselves. This anomalousness-- at least as it applies to Michigan's retroactive application of new *federal* rules-- is further heightened when, as in the instant case, (a) the federal rule contradicts the laws of our state as enacted by the Legislature in accordance with the will of the people of Michigan and (b) the Supreme Court has, for purposes of federal court application, specifically rejected the retroactivity test adopted by Michigan. See *Teague*, 489 US 288. This issue not having been the focal point of briefing or argument, we do not address it further in this case.

each.  The United States Supreme Court, in applying the *Linkletter* test before it adopted the *Teague* test, observed that the second and third factors "have been regarded as having controlling significance 'only when the purpose of the rule in question did not clearly favor either retroactivity or prospectivity.' " *Michigan v Payne*, 412 US 47, 55; 93 S Ct 1966; 36 L Ed 2d 736 (1973), quoting *Desist v United States*, 394 US 244, 251; 89 S Ct 1030; 22 L Ed 2d 248 (1969).  Deductively from this statement, if two of the three factors only control when the first factor does not "clearly favor" retroactivity or prospectivity, it follows that the first factor must be afforded more weight than either of the other two factors when the first factor *does* "clearly favor" retroactivity or prospectivity.  We are persuaded by, and adhere to, *Payne*'s and *Desist*'s understanding regarding the heightened weight to be afforded the first factor when it strongly supports one side or the other of the retroactivity question.

Placing such an emphasis on the first factor is fully consistent with this Court's longstanding practice of dealing with the second and third factors "together." *Young*, 410 Mich at 367; *Hampton*, 384 Mich at 677.  In this sense, the second and third factors will generally tend to produce a unified result that either favors or disfavors retroactivity. This is because the subject of the second factor (general reliance on the old rule) "will often have a profound effect on" the subject of the third factor (administration of justice), given that the greater the reliance by prosecutors of this state on a rule in pursuing justice, the more burdensome it will generally be for the judiciary to *undo* the administration of that rule.  *Sexton*, 458 Mich at 63-64; see also *Hampton*, 384 Mich at 677-678.  In light of the weight to be afforded the first factor when it clearly preponderates against retroactive

54

application, our unified consideration of the second and third factors would need to favor retroactive application to a substantial degree in order for *Miller* to satisfy the requirements for retroactive application under our state test.

Turning to the inquiry required to evaluate the second and third factors "together," the second factor-- the reliance on the old rule-- must be considered both from the perspective of prosecutors across the state when prosecutors faithfully abided by the constitutional guarantees in place at the time of a defendant's conviction, see *Adams v Illinois*, 405 US 278, 283-284; 92 S Ct 916; 31 L Ed 2d 202 (1972), and *Johnson v New Jersey*, 384 US 719, 731; 86 S Ct 1772; 16 L Ed 2d 882 (1996), as well as from the collective perspective of the 334 defendants who would be entitled to resentencing if the new rule were applied retroactively, see *Maxson*, 482 Mich at 394. Inherent in the question of reliance by prosecutors across the state is the extent to which the old rule received constitutional approval from the judiciary before the adoption of the new rule. See *Tehan v United States ex rel Shott*, 382 US 406, 417; 86 S Ct 459; 15 L Ed 2d 453 (1966). When the old rule is merely the result of a "negative implication" drawn by prosecutors, the prosecutors' good-faith reliance on the old rule is at its most minimal. *Brown v Louisiana*, 447 US 323, 335; 100 S Ct 2214; 65 L Ed 2d 159 (1980) (opinion by Brennan, J.). Similarly, when the old rule was of "doubtful constitutionality," the ability of prosecutors across the state to rely on the old rule in good faith is diminished. *Id*. Conversely, when the old rule has been specifically approved by the courts as passing constitutional muster, prosecutors have their strongest argument for having relied on the old rule in good faith. *Tehan*, 382 US at 417. Moreover, when prosecutors relied in good

55

faith on the old rule and did so for a lengthier period of time, reliance can be viewed as more significant and the second factor will tend to counsel against retroactive application. *Id*. As for defendants' reliance on the old rule, they must demonstrate not only that they relied on the old rule by taking or not taking a specific action, but that they "*detrimentally relied on the old rule.*" *Maxson*, 482 Mich at 394 (emphasis added).

The inquiry into reliance will significantly affect any inquiry into the burden placed on the administration of justice because when prosecutors have relied on the *old* rule, they have presumably taken few, if any, steps to comply with the *new* rule. The greater the extent of their reliance, and the greater the extent to which the new rule constitutes a departure from the old rule, the more burdensome it becomes for prosecutors to take the steps necessary to comply with the new rule. Similarly, the greater the extent of the departure, the more difficult it becomes for courts to look back and attempt to reconstruct what outcome would have resulted had the new rule governed at the time a given defendant was sentenced. A burden is placed on the administration of justice in the form of time and expense to the judiciary in retroactively accommodating the new rule. Far more importantly, when a new rule is likely to be difficult to apply retroactively, a burden is placed on the administration of justice in the form of compromising the accuracy with which the new rule can be applied and the confidence the public may have regarding judicial determinations in situations in which the new rule is applied to cases that became final many years or even decades earlier.

Applying these considerations in evaluating the second and third factors to *Miller*, it is apparent that these factors do not sufficiently favor the retroactive application of

*Miller* so as to overcome the first factor's clear direction against its retroactive application. The old rule permitting life-without-parole sentences on the basis of the pre-*Miller* sentencing scheme established by the Legislature received in 1996 the specific approval of its constitutionality by our judiciary. *Launsburry*, 217 Mich App at 363-365. Further, nothing in United States Supreme Court caselaw called into any question life-without-parole sentences for any juvenile offenders until *Graham* was decided in 2010, and even then *Graham* was specifically limited in its breadth to juveniles who committed nonhomicide offenses.[31] *Graham*, 560 US at 82. Indeed, before *Roper* in 2005, United States Supreme Court precedent specifically held that it was constitutional to impose capital punishment on juveniles over the age of 16 convicted of homicide offenses. *Stanford v Kentucky*, 492 US 361, 380; 109 S Ct 2969; 106 L Ed 2d 306 (1989). Accordingly, at the time prosecutors across Michigan sought life-without-parole sentences for 302 of the 334 defendants who would gain a resentencing hearing if *Miller* were applied retroactively, the Eighth Amendment of the United States Constitution was affirmatively understood as permitting the imposition of not merely life without parole but also the imposition of capital punishment on juvenile first-degree-murder offenders.[32]

---

[31] Interestingly, we note that *none* of the 334 defendants who would receive resentencing under *Miller* if it were applied retroactively to cases that had become final before *Miller* was issued was sentenced after *Graham* was decided. Therefore, to whatever extent it might be argued that *Graham* weakened the constitutional foundation of the old rule permitting life-without-parole sentences for juvenile homicide offenders, the argument is of little relevance to the retroactive application of *Miller* regarding any juvenile defendants currently serving life-without-parole sentences in Michigan.

[32] Even with respect to the 34 defendants sentenced post-*Roper*, there was no cause for prosecutors to believe that the decision had any significant bearing on their ability, on behalf of the people of Michigan, to constitutionally seek a sentence of life without

On the basis of this state of the law, prosecutors across Michigan entirely in good faith relied on the old rule whenever they sought life-without-parole sentences for juvenile homicide offenders. Considering the constitutional approval the old rule received from both our judiciary and the United States Supreme Court, as well as the length of time during which the old rule prevailed-- dating back to our state's founding in 1837-- the reliance on the old rule by Michigan prosecutors was significant and justified.[33]

Conversely, we note that this is not a situation in which it can fairly be said that, as a group, the 334 defendants who would be entitled to resentencing if the rule in *Miller* were applied retroactively have "relied" on the old rule to their "detriment." First, we find it difficult to understand, and Carp and Davis themselves fail to identify, exactly what adverse action the 334 defendants have taken, or opted not to take, in "reliance" on

---

parole or that it brought into question the decision in *Launsburry* upholding the imposition of life-without-parole sentences.

[33] Although *Maxson*'s analysis of the second factor focused exclusively on whether the defendants in that case had detrimentally relied on the old rule without considering the extent to which prosecutors had detrimentally relied on the old rule, *Maxson*'s approach to analyzing the second factor is not inconsistent with the approach we use today. When there are two relevant entities, concluding that one of these entities has or has not relied detrimentally on the old rule may be sufficient to reach a conclusion concerning the effect of the second factor on retroactivity. In *Maxson*, it was clear that the defendants' detrimental reliance on the old rule was insignificant so it was unnecessary to consider the extent to which prosecutors had relied on the old rule at issue in that case. Although the inverse is largely true here in that the detrimental reliance interests of prosecutors across this state are considerable, we have reviewed what is asserted to be Carp's and Davis's detrimental reliance on the old rule and see none. Once again, merely to act in accord with the old rule is not tantamount to detrimental reliance.

the old rule (except perhaps to recognize and abide by the old rule as the then extant law of this state).[34] If such "reliance," in the sense of merely having to comply with the then extant law, is viewed as sufficiently "detrimental" to satisfy the second state retroactivity factor, then it would almost always be the case that this factor would weigh heavily in favor of retroactivity, since it must be assumed that criminal defendants, or at least their counsels, would almost always rely on existing law in formulating their trial and appellate strategies. There is nothing "detrimental" about that reliance except that the

---

[34] The dissent similarly struggles to identify what action that would have benefited the 334 defendants was taken or not taken in "detrimental reliance" on the old rule. First, the dissent asserts that *trial courts* would have engaged in individualized sentencing hearings, but for the old rule. *Post* at 26-27. This, however, is an action that *courts*, not a defendant, would have taken, and essentially asserts nothing more than that *Miller* has altered the rules. Second, the dissent argues that defendants relied on the old rule by not seeking appellate review of their life-without-parole sentences. *Post* at 26 n 86. In making this argument, the dissent compares this case to *Maxson*, in which this Court suggested that a defendant's decision not to pursue an appeal could constitute an action that the defendant opted not to take in reliance on the old rule. *Maxson*, 482 Mich at 394-395. However, *Maxson* was addressing the retroactivity of *Halbert v Michigan*, 545 US 605; 125 S Ct 2582; 162 L Ed 2d 552 (2005), "which held that indigent defendants who plead guilty to criminal offenses are entitled to appointed appellate counsel on direct appeal." *Maxson*, 482 Mich at 387. Accordingly, the old rule analyzed in *Maxson*, that indigent defendants who pleaded guilty to criminal offenses were not entitled to appointed appellate counsel on direct appeal, served as a direct impediment to a defendant's ability to file an appeal after pleading guilty. In these cases, the pre-*Miller* constitutionality of imposing life-without-parole sentences on juvenile homicide offenders by mandatory operation of law did nothing to hinder a defendant's ability to file an appeal challenging Michigan's then extant sentencing scheme or its personal application. Furthermore, as Michigan caselaw had specifically upheld the constitutionality of our pre-*Miller* sentencing scheme, *Launsburry*, 217 Mich App 358, it is unclear how defendants' failures to seek appellate review proved detrimental. While the dissent is obviously correct that their interests were not favored under the old rule to the extent they are under the new rule, that is not the equivalent of having "detrimentally relied" on the old rule.

law is not as hospitable to the interests of such defendants as they might like it to be. That the law might have been destined to become more hospitable in the future is of little relevance since it is only because of that development that the issue of retroactivity has arisen in the first place.

Second, even to the extent that any defendants can be said to have taken or foregone some action to their detriment in reliance on the old rule, they still can only be said to have "detrimentally" relied on the old rule if they can establish that they would have obtained a result more favorable to them under the new rule. *Maxson*, 482 Mich at 394-396. In this sense, defendants can only be said to have " 'detrimentally relied' on the old rule" if they "*suffered actual harm* from [their] reliance . . . ." *Id*. at 396. However, a majority of the 334 defendants who would receive resentencing hearings if the rule in *Miller* were applied retroactively were between 17 and 18 years of age when they committed their homicide offenses. Because *Miller* requires a sentencing court to give specific consideration to the age and the mental development of a juvenile offender before imposing a sentence of life without parole, when a juvenile most closely approaches the age of majority at the time the juvenile commits a homicide offense, *Miller* would seem least likely to counsel in favor of sentencing that juvenile with special leniency, given that in only as few as several months the juvenile would be ineligible for any leniency at all.[35] In this sense, it is speculative at best to presume that a majority of

---

[35] In focusing on the age of the defendants who would receive resentencing if *Miller* were applied retroactively, we nowhere suggest that age is the exclusive factor that the trial court should consider in imposing a sentence on a juvenile homicide offender, and we agree with the dissent that *Miller* calls for a "multifaceted" approach to sentencing. Compare page 17 of this opinion with *post* 27 n 88. However, in light of the other factors

Michigan's juvenile offenders serving life-without-parole sentences would gain relief in the form of a lesser sentence if they received a resentencing hearing pursuant to the retroactive application of *Miller*. Accordingly, juvenile defendants, as a class, are unable to demonstrate with any certainty under the state test that they *detrimentally* relied on the old rule to such an extent as to outweigh the state's reliance on the old rule.

As between defendants and the prosecutors of this state, it is further apparent that the *latter* have relied far more heavily on the old rule, have done so in good faith, and would have relied "detrimentally" on behalf of the people were *Miller* to be applied retroactively. In particular, in relying on the old rule, prosecutors did not for the purpose of sentencing have any cause at the time to investigate or present evidence concerning the aggravating or mitigating factors now required to be considered by *Miller*. If *Miller* were to be applied retroactively, prosecutors would be abruptly required to bear the considerable expense of having to investigate the nature of the offense and the character of the 334 juvenile offenders subject to *Miller*'s retroactive application. This task, if

that *Miller* instructs a trial court to consider, it seems apparent that a juvenile's age at the time of the offense will weigh relatively heavily at sentencing hearings. In most cases, a juvenile's age will reasonably correspond to his or her mental and emotional development as well as the ability to overcome a difficult family and home life. Additionally, as a juvenile approaches 18 years of age at the time of the offense, and may even turn 18 during the proceedings related to the offense, it follows that the "incompetencies associated with youth" will come to have increasingly less of an effect on the juvenile's ability to communicate with, and to assist, his or her attorneys in their legal preparations. Accordingly, while age is by no means the only factor to be considered in imposing a sentence pursuant to *Miller*, an offender's age is likely to be given significant weight in the court's deliberations and may well constitute the single best factor for ascertaining whether a *Miller*-benefited offender would actually gain relief if *Miller* were applied retroactively.

newly thrust upon prosecutors, would be all the more burdensome and complicated because a majority of the 334 defendants were sentenced more than 20 years ago and another 25% were sentenced between 15 and 20 years ago. And in many, if not most, of those instances, the prosecutor who initially tried the case would likely no longer be available for a resentencing hearing. That is, *Miller* makes many things relevant to the sentencing process that were simply not relevant at the time of the initial sentencing, and these things would have to be reconstructed, almost impossibly so in some cases, after many years, in order to sustain a criminal sentence that was viewed at the time as the culmination of a full and fair process by which justice was obtained in cases of first-degree murder. There would be considerable financial, logistical, and practical barriers placed on prosecutors to re-create or relocate evidence that had previously been viewed as irrelevant and unnecessary. This process would not, in our judgment, further the achievement of justice under the law because it would require in many instances that the impossible be done, and if it could not be, a heavy cost would be incurred by society in the form of the premature release of large numbers of persons who will not have fully paid their legal debt to society, many of whom as a result might well continue to pose a physical threat in particular to individuals living in our most vulnerable neighborhoods.

*Miller* requires trial courts to determine a defendant's moral culpability for the murder the defendant has committed by examining the defendant's character and mental development *at the time of the offense*. Even if the myriad evidence could somehow be obtained by the prosecutor, it is fanciful to believe that the backward-looking determination then required of the trial court could be undertaken with sufficient

62

accuracy and trustworthiness so many years after the crime had been committed, the trial completed, and the defendant sentenced. Further, just as the prosecutor might no longer be available to represent the people's interest, neither might the sentencing judge. We are not confident that the justice achieved by a resentencing process taking place many years after the original trial and sentencing-- many years after the victims of the homicide have become little more than historical footnotes to all but their immediate families-- and presided over by a judge who can never entirely be situated like the judge who presided over the trial, can effectively replicate the justice achieved at the initial sentencing. Instead, we believe that the trial court's ability to travel back in time to assess a defendant's mental state of some 20 years earlier-- evidence of which may not even have been gathered at the time-- is limited; that the recollection of memories about aggravating and mitigating circumstances-- evidence of which may again not even have been gathered at the time-- is questionable; and that, as a result, public confidence in the integrity and accuracy of those proceedings will understandably be low.

For these reasons, we find that the second and third factors do not sufficiently favor the retroactive application of *Miller* so as to overcome the first factor counseling against the retroactive application of *Miller*. As a result of this analysis, *Miller* is not entitled to retroactive application under Michigan's test for retroactivity.

### D. CONSTITUTIONAL ISSUES

Defendants raise a series of constitutional challenges arguing that the Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16, or both,

categorically bars the imposition of a life-without-parole sentence on a juvenile homicide offender. We consider each challenge in turn.

## 1. FEDERAL CATEGORICAL BAR

Defendants assert that the Eighth Amendment of the United States Constitution[36] categorically bars the imposition of a sentence of life without parole on any juvenile homicide offender, regardless of whether the "individualization" of sentencing is performed before that sentence is imposed. The effect of the categorical rule sought by defendants would not only mandate resentencing for all juvenile defendants sentenced to life without parole under the pre-*Miller* sentencing scheme, but would also invalidate those portions of MCL 769.25 allowing the state to impose a life-without-parole sentence on particular juveniles following an individualized sentencing hearing in accordance with *Miller*. See MCL 769.25(2) through (7). Defendants ask this Court to read the United States Supreme Court's rulings in *Roper*, *Graham*, and *Miller* as necessarily foreshadowing the conclusion that the Eighth Amendment categorically bars life-without-parole sentences for all juvenile offenders. However, the limited nature of each of these rulings does not, in our judgment, necessitate that conclusion. Moreover, the proportionality review employed by the United States Supreme Court in fashioning the rules in *Roper*, *Graham*, and *Miller* also does not support the categorical rule sought by defendants.

---

[36] The Eighth Amendment of the United States Constitution reads:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. [US Const, Am VIII.]

As noted earlier, the holding in *Roper* was specifically limited to capital punishment in that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Roper*, 543 US at 578. Given that capital punishment was only "likened" to life without parole for a juvenile offender, *Miller*, 567 US at ___; 132 S Ct at 2463-2464, rather than deemed equivalent to life without parole for a juvenile offender, neither *Roper* nor *Roper* in conjunction with *Graham* and *Miller* suggests in any way that the Eighth Amendment must be read as invalidating the state's ability to impose a life-without-parole sentence on a juvenile homicide offender. Likewise, *Graham*'s holding was specifically limited so as to categorically bar only the imposition of life-without-parole sentences for juvenile offenders convicted of nonhomicide offenses. *Graham*, 560 US at 79. Accordingly, *Graham* also does not compel the invalidation of a state's ability to impose a sentence of life without parole on a juvenile homicide offender.

Turning lastly to *Miller*, its rule is specifically limited in that it counsels *against* the very categorical rule sought by defendants. As discussed earlier, *Miller* requires that an individualized sentencing hearing occur before a life-without-parole sentence may be imposed, but expressly "does not categorically bar a penalty" or "foreclose a sentencer's ability" to impose a life-without-parole sentence. *Miller*, 567 US at ___; 132 S Ct at 2469, 2471. Defendants' proposed categorical rule would therefore read the Eighth Amendment as categorically barring precisely the very punishment that *Miller* declined to categorically bar and, in so doing, asserted was not categorically barred by the Eighth Amendment.

65

Defendants alternatively contend that, in light of the manner in which state legislatures reacted to *Miller* by adjusting sentencing schemes governing juvenile homicide offenders, it is *now*, pursuant to the proportionality review employed in *Roper*, *Graham*, and *Miller*, cruel and unusual punishment to impose a life-without-parole sentence on a juvenile homicide offender. Within the context of the Eighth Amendment, the United States Supreme Court has used a multipart test to determine if a punishment imposed on a juvenile offender is disproportionate:

> A court must begin by comparing the gravity of the offense and the severity of the sentence. "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual. [*Graham*, 560 US at 60, quoting *Harmelin*, 501 US at 1005 (Kennedy, J., concurring in part).]

Starting with the preliminary question whether "the gravity of the offense" is commensurate with "the severity of the sentence," *Graham*, 560 US at 60, we note that first-degree murder is almost certainly the gravest and most serious offense that an individual can commit under the laws of Michigan-- the premeditated taking of an innocent human life. It is, therefore, unsurprising that the people of this state, through the Legislature, would have chosen to impose the most severe punishment authorized by the laws of Michigan for this offense. Although the individualized sentencing process now required by *Miller* (and as a necessary response to *Miller* by MCL 769.25) may perhaps indicate that some juvenile offenders lack the moral culpability and mental faculties to warrant a life-without-parole sentence pursuant to the premises of *Miller*, when the

contrary conclusions are drawn, as they presumably will be in some cases, a sentence of life without parole for first-degree murder will not "lead[] to an inference of gross disproportionality." *Id*. Accordingly, defendants have failed to demonstrate that the imposition of a life-without-parole sentence will satisfy the first part of the United States Supreme Court's test for proportionality. As the first part of this federal test is a *necessary* requirement for finding that a punishment is "disproportionate," defendants' facial challenge fails as they are consequently unable to demonstrate that the Eighth Amendment categorically bars the imposition of a life-without-parole sentence on juvenile homicide offenders.

Even if defendants had satisfied the first part of the federal test for disproportionality, however, they have also failed to satisfy the second part of the test, which compares the life-without-parole sentence defendants seek to invalidate "with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Id*. As for other offenders within the state of Michigan, defendants are correct to note that life without parole is the most severe punishment imposed by this state. This fact alone, however, does not persuade us that imposing a life-without-parole sentence on a juvenile homicide offender is disproportionate.

First, as noted in the first part of this test for proportionality, first-degree murder is almost certainly the gravest and most serious offense that can be committed under the laws of Michigan. As with juveniles, adult offenders who commit the offense of first-degree murder face the same sentence of life without parole. Because some juvenile

67

offenders will possess the same mental faculties of an adult so that they are equally able to recognize the consequences of their crimes and form an unequivocal premeditated intent to kill in the face of the consequences, it is not categorically disproportionate to punish at least some juvenile offenders the same as adults.

Second, there are some nonhomicide offenses that may be viewed as less grave and less serious than first-degree murder and for which only adult offenders face a life-without-parole sentence in this state. For instance, an adult who commits successive first-degree criminal sexual conduct offenses against an individual under the age of 13 faces a sentence of life without parole. MCL 750.520b(2)(c). Accordingly, when the commission of a nonhomicide offense by an adult offender may result in the imposition of a life-without-parole sentence, it does not appear categorically disproportionate to impose a life-without-parole sentence on a juvenile offender for committing the gravest and most serious homicide offense.

Third, although this Court is required by *Graham* to assess the proportionality of a sentence of life without parole imposed on juveniles who commit first-degree murder, we would be derelict if we did not observe that the people of this state, acting through their Legislature, have already exercised their judgment-- to which we owe considerable deference-- that the sanction they have selected for juvenile first-degree-murder offenders is, in fact, a proportionate sanction. We are not certain that there is a superior test for assessing a determination of proportionality than that a particular sanction is compatible with public opinion and sentiment. Nonetheless, because this Court is required to do so by *Graham*, we undertake to the best of our ability to exercise independent judgment in

analyzing the criminal punishments authorized by our Legislature and assessing their propriety in the light of the crimes for which the Legislature has deemed them proportionate.

Turning to whether Michigan's sentencing scheme for juvenile first-degree-murder offenders is "disproportionate" to sentencing schemes used in other states, defendants have wholly failed to present relevant data demonstrating that Michigan is an outlier when it comes to permitting the imposition of life-without-parole sentences for juvenile first-degree-murder offenders, even on the assumption that being an "outlier" adversely affects our state's compliance with the United States Constitution. Defendants in their briefs cherry-pick six states in which sentencing schemes have been altered post-*Miller* to eliminate life-without-parole as a possible sentence for juvenile offenders. The fact that six states have eliminated life-without-parole sentences for juvenile offenders in response to *Miller* tells us next to nothing about how Michigan's choice to impose life-without-parole sentences on juveniles convicted of first-degree murder compares to sentencing schemes across the nation, and defendants have come nowhere close to satisfying their burdens in this regard.

What trend is demonstrated by the actions of these six states alone? How many states at the time of *Miller* imposed a sentence of life without parole on juvenile homicide offenders? How many of these states responded to *Miller* in a manner similar to that of Michigan? What *is* apparent is that at the time of *Miller*, "26 States . . . [made] life without parole the mandatory (or mandatory minimum) punishment for some form of murder, and would apply the relevant provision to 14-year-olds . . . ." *Miller*, 567 US at

___ n 9; 132 S Ct at 2471 n 9. Another 15 states allowed for the discretionary imposition of life-without-parole sentences on juvenile offenders. *Id*. at ___ n 10; 132 S Ct at 2472 n 10. Combined therefore, 41 states exercised the authority under at least some circumstances to impose a life-without-parole sentence on a juvenile. If, as defendants assert, six of those states have departed from this practice by eliminating that sentence altogether, can it be concluded that life-without-parole sentences for juveniles are disproportionte when they remain an option of some kind in 35 states in total, or 70% of the states composing the Union?

In summary, we have no evidence that sustains defendants' burden of demonstrating that Michigan's statutory scheme is categorically disproportionate to those of other states. As defendants have failed to demonstrate that either part of the federal test for the constitutionality of punishments supports the conclusion that a life-without-parole sentence for juvenile homicide offenders is disproportionate, we decline to hold that the Eighth Amendment of the United States Constitution categorically bars that punishment.

### 2. STATE CATEGORICAL BAR

Defendants next contend that even if the Eighth Amendment does not categorically bar the imposition of sentences of life without parole on juvenile homicide offenders, Const 1963, art 1, § 16 does mandate such a categorical bar. Whereas the Eighth Amendment proscribes the imposition of "cruel *and* unusual punishment*s*," Const 1963, art 1, § 16 states:

> Excessive bail shall not be required; excessive fines shall not be imposed; cruel *or* unusual punishment shall not be inflicted; nor shall witnesses be unreasonably detained. [Emphasis added.]

The textual difference between the federal constitutional protection and the state constitutional protection is of consequence and has led this Court to conclude that Article 1, § 16 provides greater protection against certain punishments than its federal counterpart in that if a punishment must be both "cruel" *and* "unusual" for it to be proscribed by the Eighth Amendment, a "punishment that is unusual but not necessarily cruel" is also proscribed by Article 1, § 16. *People v Lorentzen*, 387 Mich 167, 172; 194 NW2d 827 (1972).

This broader protection under Article 1, § 16 against punishments that are merely "unusual" has led this Court to adopt a slightly different and broader test for proportionality than that employed in *Graham*. See *id*. at 171-172; see also *People v Bullock*, 440 Mich 15, 31; 485 NW2d 866 (1992).[37] As set forth in *Lorentzen* and *Bullock*, the state test for proportionality assesses (1) the severity of the sentence imposed

---

[37] The inclusion of proportionality review under Article 1, § 16 has been the subject of significant disagreement. *Bullock*, 440 Mich at 46 (RILEY, J., concurring in part and dissenting in part) ("I believe that *People v Lorentzen . . .* , the principle case relied on by the majority to support its conclusion, was wrongly decided and that proportionality is not, and has never been, a component of the 'cruel or unusual punishment' clause of this state's constitution."); *People v Correa*, 488 Mich 989, 992 (2010) (MARKMAN, J., joined by CORRIGAN and YOUNG, JJ., concurring) ("[A]t some point, this Court should revisit *Bullock*'s establishment of proportionality review of criminal sentences, and reconsider Justice RILEY's dissenting opinion in that case."). However, because life without parole is not a categorically disproportionate sentence for a juvenile homicide offender, we find it unnecessary in this case to resolve whether proportionality review is rightly a part of the protection in Article 1, § 16 against "cruel or unusual punishment," instead assuming for the sake of argument that it has a place in an analysis under Article 1, § 16.

compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in the same jurisdiction, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation. *Bullock*, 440 Mich at 33-34, citing *Lorentzen*, 387 Mich at 176-181.

At the outset, we note that the *Lorentzen*/*Bullock* test bears a considerable resemblance to the federal test for proportionality because the first three factors combine to effect the same general inquiry as the two-part test employed in *Graham*. See *Bullock*, 440 Mich at 33 ("Our analysis in *Lorentzen* foreshadowed in a striking manner the three-pronged test later adopted by the United States Supreme Court in *Solem v Helm*, 463 US 277, 290-291; 103 S Ct 3001; 77 L Ed 2d 637 (1983)."). Our conclusion that none of the first three factors supports the inference that a life-without-parole sentence for a juvenile offender is disproportionate under the Eighth Amendment also bears on the first three inquires of the proportionality analysis under the *Lorentzen*/*Bullock* test. Accordingly, only the fourth factor of the *Lorentzen*/*Bullock* test remains to be assessed before weighing these factors and reaching a conclusion about the proportionality of a life-without-parole sentence for a juvenile homicide offender under Article 1, § 16 of our state constitution.

Concerning the fourth factor, we concur with the United States Supreme Court's assessment that a life-without-parole sentence for a juvenile does not serve the

penological goal of rehabilitation.[38]  *Graham*, 560 US at 74.  As stated in *Graham*, when life without parole is imposed on a juvenile, "[t]he penalty forswears altogether the rehabilitative ideal.  By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society."  *Id*.  Accordingly, the fourth factor of the *Lorentzen/Bullock* test supports defendants' contention that a life-without-parole sentence for a juvenile offender is disproportionate.  That said, with only one of the four factors supporting the conclusion that life-without-parole sentences are disproportionate when imposed on juvenile homicide offenders, defendants have failed to meet their burden of demonstrating that it is facially unconstitutional under Article 1, § 16 to impose that sentence on a juvenile homicide offender.  While the language of the Michigan counterpart to the Eighth Amendment is at some variance from the latter, it is not so substantially at variance that it results in any different conclusion in its fundamental analysis of proportionality.

### 3.  AIDING AND ABETTING

Davis argues that even if the Eighth Amendment does not categorically bar imposing sentences of life without parole on juvenile homicide offenders, it at least

---

[38] In accepting this conclusion, this Court, as did the United States Supreme Court, speaks of "rehabilitation" exclusively within the context of a defendant reforming himself or herself for the purpose of reintegration into society.  See *Graham*, 560 US at 74.  This, however, is not to foreclose the ability of a person, however long the person is to be incarcerated, to rehabilitate himself or herself in the sense of fully comprehending the nature of the wrong, achieving a greater awareness of and commitment to the elements of moral behavior, attaining a sincere adherence to religious faith, or contributing in positive ways to those with whom the person interacts in whatever environment he or she has been placed.

categorically bars imposing life-without-parole sentences on juvenile homicide offenders, such as himself, convicted of felony murder ostensibly on the basis of an aiding-and-abetting theory. At the outset of our analysis, we note that our Legislature has chosen to treat offenders who aid and abet the commission of an offense in exactly the same manner as those offenders who more directly commit the offense:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense. [MCL 767.39.]

Moreover, the Legislature has enacted a felony-murder statute, which treats the commission of a murder during the course of a robbery as first-degree murder. See MCL 750.316(1)(b).[39] These choices by the Legislature must be afforded great weight in light of the fact that *Lockett*, one of the capital-punishment cases relied on by the United States Supreme Court in forming the rule in *Miller*, specifically instructs:

> That States have authority to make aiders and abettors equally responsible, as a matter of law, with principals, or to enact felony-murder statutes is beyond constitutional challenge. [*Lockett*, 438 US at 602.]

Davis attempts to overcome this constitutional pronouncement in light of his own proposed categorical rule mandating a lesser maximum penalty for aiders and abettors by asserting that *Miller* and *Graham* combine to necessitate such a rule. He advances a two-

---

[39] We speak of the felony-murder statute in terms of the underlying felony being a robbery merely because the underlying felony in Davis's case was a robbery. The reasoning put forth in this part, however, would apply equally when the underlying felony is any one of the other felonies listed in MCL 750.316(1)(b).

74

part argument to this effect: (1) the rule in *Miller* requires individualized sentencing for juvenile offenders in an effort to account for "their lesser culpability," *Miller*, 567 US at ___; 132 S Ct at 2463, and (2) *Graham* has already determined that aiders and abettors are sufficiently less culpable that a sentence of life without parole is never constitutionally appropriate, see *Graham*, 560 US at 69.

Although the first part of this syllogism is undoubtedly accurate, the same cannot be said of the second part. *Graham* made two statements pertinent to the second part of Davis's argument:

> The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. . . .
>
> It follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. [*Id*.]

In combination with *Miller*'s requirement that individualized sentencing account for a juvenile's "lesser culpability," it has been argued that a juvenile offender cannot be sentenced to life without parole when the defendant did not kill, intend to kill, or foresee that life would be taken as a result of the offense, even when the offense of which the offender was convicted was felony murder. Just such a contention was advanced by Justice Breyer in his concurrence in *Miller*, in which, addressing specifically the constitutionality of life-without-parole sentences for juvenile offenders convicted of felony murder on an aiding-and-abetting theory, he stated, "*Graham* dictates a clear rule: The only juveniles who may constitutionally be sentenced to life without parole are those

convicted of homicide offenses who 'kill or intend to kill.' " *Miller*, 567 US at ___; 132

S Ct at 2476 (Breyer, J., concurring).

Assuming for the sake of argument that some categorical rule of this nature is the

necessary product of *Graham* and *Miller*,[40] it still does not follow that the rule pertains to

and encompasses all instances in which a juvenile aids and abets a felony murder. As

recognized by Justice Breyer himself, a juvenile who aids and abets a felony murder *may*

have intended the death of any victim of the offense. *Id*. at ___; 132 S Ct at 2477

(indicating that on remand, the trial court would need to determine if the defendant, who

was convicted of felony murder for aiding and abetting the commission of a robbery that

resulted in a death, "did intend to cause the clerk's death"). Further, a juvenile who aids

and abets a felony murder *may* have foreseen that a life might be taken as a result of his

offense, but proceeded notwithstanding to engage in the underlying offense with

indifference to this risk. Accordingly, when a juvenile can be convicted of felony murder

on an aiding-and-abetting theory while either intending to kill or having foreseen the

possibility that a life could be taken, any categorical rule gleaned from *Graham*

pertaining to the limited situation in which a juvenile homicide offender lacked the intent

---

[40] Although we assume for the sake of argument that such a categorical rule may exist, nothing in this opinion should be understood as actually accepting or adopting such a rule. To the contrary, we note that a categorical rule mandating that a subclass of aiders and abettors be treated differently with respect to what punishments can be imposed would run directly contrary to both the aforementioned statement in *Lockett* and MCL 767.39. Further, Justice Breyer in his concurrence spoke only for himself and one other justice.

to kill and did not foresee the possibility that a life could be taken will once again not *categorically* bar the imposition of a sentence of life without parole for that offense.[41]

This conclusion is entirely consistent with, and arguably dictated by, the individualized sentencing process required by *Miller*.  In seeking to assess a juvenile offender's moral culpability, *Miller* instructs trial courts to consider the " 'circumstances of the particular offense *and* the character and propensities of the offender.' "  *Id*. at ___ n 9; 132 S Ct at 2471 n 9, quoting *Roberts*, 428 US at 333, and citing *Sumner*, 483 US 66 (emphasis added).  A categorical rule altogether foreclosing a trial court from imposing a life-without-parole sentence on a juvenile convicted of felony murder on an aiding-and-abetting theory obviates the necessity for any evaluation of either the circumstances of the individual defendant's offense or the individual defendant's character.  Such a categorical rule would permit a defendant to avoid a life-without-parole sentence for aiding and abetting a felony murder even if the defendant was closely nearing the age of 18 at the time of the offense, intended the death of the victim by instructing a coconspirator to fire the fatal shot, and had had previous encounters with the criminal justice system that demonstrated a lack of amenability to rehabilitation.  Because it is not

---

[41] To the extent that *Graham* and *Miller* might create a categorical rule prohibiting life-without-parole sentences for juveniles convicted of aiding and abetting a felony murder "who do not kill, intend to kill, or foresee that life will be taken," *Graham*, 560 US at 69, Davis would not be entitled to relief under that rule.  Although the trial court concluded at sentencing that Davis was not the shooter, it did not make an explicit finding regarding Davis's intentions about the victim's death, and it made no findings indicative of whether he foresaw the potential that life would be taken as a result of the armed robbery in which he engaged.  To go back and attempt to make these findings now would entail engaging in the broader individualized sentencing procedures called for by *Miller* that we have already determined today need not be engaged in retroactively.

difficult to imagine such a defendant, and because imposing a life-without-parole sentence on that defendant would be warranted and entirely constitutional under *Miller*, we reject Davis's facial challenge and his contention that the Eighth Amendment categorically bars the imposition of a life-without-parole sentence on a juvenile convicted of felony murder on an aiding-and-abetting theory.[42]

## 4. RIPENESS

Eliason asserts that Const 1963, art 1, § 16 categorically bars the imposition of a sentence of life without parole on a juvenile homicide offender who is 14 years of age at the time of the offense. For Eliason's facial challenge to be ripe, there must be "a real and immediate threat . . . as opposed to a hypothetical one" that a sentence of life without parole will be imposed on him. *Conat*, 238 Mich App at 145, citing *Los Angeles v Lyons*,

---

[42] This holding carries with it the conclusion that some juveniles convicted of felony murder on an aiding-and-abetting theory might be as morally culpable for their crimes as juveniles who commit premeditated first-degree murder and not simply as legally culpable. A juvenile convicted of felony murder on an aiding-and-abetting theory can be said to have committed as grave an offense as a juvenile who commits premeditated first-degree murder. Accordingly, for the purpose of Davis's challenge under Const 1963, art 1, § 16, the first two factors of the *Lorentzen*/*Bullock* proportionality test will be resolved in a fashion identical to how they were resolved for life-without-parole sentences generally. Concerning the third factor, Davis fails to present any data specific to how other jurisdictions sentence juveniles convicted of felony murder on an aiding-and-abetting theory, only putting forth a sampling of how a very few states now sentence juveniles convicted of first-degree murder generally. In the absence of evidence to the contrary, we are left to assume that a majority of other states hold aiders and abettors equally responsible for their offenses. Accordingly, the third factor also counsels against a finding of disproportionality. Because only the fourth factor of the *Lorentzen*/*Bullock* proportionality test, pertaining to rehabilitation, favors holding life-without-parole sentences for juveniles convicted of felony murder on an aiding-and-abetting theory unconstitutional, Davis's facial challenge under Article 1, § 16 fails as well.

461 US 95, 101-101; 103 S Ct 1660; 75 L Ed 2d 675 (1983), and *Dep't of Social Servs v Emmanuel Baptist Preschool*, 434 Mich 380, 410; 455 NW2d 1 (1990) (CAVANAGH, J.). Put differently, in determining whether an issue is justiciably "ripe," a court must assess " 'whether the harm asserted has matured sufficiently to warrant judicial intervention.' " *Emmanuel Baptist*, 434 Mich at 412 n 48 (citation omitted). Inherent in this assessment is the balancing of "any uncertainty as to whether defendant[] will actually suffer future injury, with the potential hardship of denying anticipatory relief." *Id*. at 412, citing *Abbott Laboratoriess v Gardner*, 387 US 136, 148-149; 87 S Ct 1507; 18 L Ed 2d 681 (1967).

Eliason was 14 years of age at the time of his offense and was initially sentenced to life without parole. However, because Eliason's case is on direct review, he is entitled to resentencing pursuant to MCL 769.25(1)(b)(*ii*). Under MCL 769.25(9), the default sentence for a juvenile convicted of first-degree murder is a sentence of a term of years within specific limits rather than life without parole. A juvenile defendant will only face a life-without-parole sentence if the prosecutor files a motion seeking that sentence and the trial court concludes following an individualized sentencing hearing in accordance with *Miller* that such a sentence is appropriate. MCL 769.25(2) through (7).

Although the prosecutor has filed a motion seeking the imposition of a sentence of life without parole, it is no more than speculation whether the trial court will depart from the default sentence in response to the prosecutor's motion and impose a life-without-parole sentence, and it is not apparent that Eliason faces a "real and immediate" threat of receiving a life-without-parole sentence. Furthermore, because he will be facing a

79

minimum sentence of "not less than 25 years," MCL 769.25(9), to deny on ripeness grounds the relief Eliason seeks will cause him no legally cognizable hardship or harm. If a life-without-parole sentence is imposed at resentencing, Eliason will have more than ample time to appeal and assert either an as-applied or a facial constitutional challenge to his sentence before he completes the minimum possible sentence for his offense. Accordingly, in light of Eliason's being entitled to resentencing under MCL 769.25, his facial constitutional challenge to life-without-parole sentences for juvenile homicide offenders who are 14 years of age at the time of their offense is no longer justiciable.[43]

## V. CONCLUSION

For these reasons, we hold that the rule set forth in *Miller* should not be retroactively applied under either the federal retroactivity test set forth in *Teague* or Michigan's separate and independent retroactivity test set forth in *Sexton* and *Maxson*. In so doing, we affirm the judgments of the Court of Appeals in *Carp* and *Davis* that *Miller* should not be applied retroactively. We further hold that neither the Eighth Amendment nor Const 1963, art 1, § 16 categorically bars the imposition of a sentence of life without parole on a juvenile first-degree-murder offender or a juvenile convicted of felony murder on the basis of an aiding-and-abetting theory. Finally, we hold that Eliason's

---

[43] As conceded by the parties at oral argument, Eliason's other issues on which this Court granted leave to appeal are moot as a result of the enactment of MCL 769.25.

80

facial constitutional challenge is no longer ripe and therefore remand his case for resentencing pursuant to MCL 769.25.

Stephen J. Markman
Robert P. Young, Jr.
Brian K. Zahra
David F. Viviano

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                   No. 146478

RAYMOND CURTIS CARP,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                   No. 146819

CORTEZ ROLAND DAVIS,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                   No. 147428

DAKOTAH WOLFGANG ELIASON,

        Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

In a series of recent cases involving juvenile offenders,[1] the United States Supreme Court has established that "children are different" as a matter of constitutional law.[2] Specifically at issue here is the application of one of those recent cases, *Miller v Alabama*, to incarcerated juvenile offenders whose direct appeals were complete when the Supreme Court decided *Miller*. In *Miller*, the Supreme Court determined that, because certain juvenile homicide offenders have "diminished culpability" when compared with adult offenders, states cannot subject juvenile homicide offenders to mandatory nonparolable life sentences.[3] By doing so, the Court expanded the range of punishments that may be imposed on juvenile homicide offenders in states, like Michigan, that had previously mandated a nonparolable life sentence whenever a juvenile

---

[1] The phrase "juvenile offenders" throughout this opinion refers to the class of individuals who were convicted for crimes committed before reaching the age of 18.

[2] *Miller v Alabama*, 567 US __; 132 S Ct 2455, 2470; 183 L Ed 2d 407 (2012). See also *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 1 (2005); *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

[3] *Miller*, 567 US at __; 132 S Ct at 2464

offender was convicted of first-degree murder in the circuit court. We conclude that *Miller* applies retroactively to cases appearing before us on collateral review, including in *People v Carp* and *People v Davis*, because it established a substantive rule of law. Alternatively, state law compels the retroactive application of *Miller*. Accordingly, we would reverse in *Carp* and *Davis* and remand those cases to the St. Clair Circuit Court and Wayne Circuit Court, respectively, for resentencing pursuant to MCL 769.25a.[4]

## I. THE EIGHTH AMENDMENT APPLIED TO JUVENILE OFFENDERS

The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishments"[5] and has a long history in American and English law predating the Bill of Rights. Similar protections were provided in various state constitutions,[6] and identical language appeared in the English Bill of Rights of 1689.[7]

---

[4] We would also remand *People v Eliason* to the Berrien Circuit Court for resentencing pursuant to MCL 769.25, as the majority does.

[5] The Cruel and Unusual Punishments clause has been incorporated to the states through the Fourteenth Amendment. See *Robinson v California*, 370 US 660; 82 S Ct 1417; 8 L Ed 2d 758 (1962). Additionally, Article 1, § 16 of the 1963 Michigan Constitution provides that "cruel or unusual punishment shall not be inflicted . . . ."

[6] For instance, the Virginia Declaration of Rights stated "[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." 5 Kurland & Lerner, The Founders' Constitution, p 373, quoting Virginia Declaration of Rights, § 9 (June 12, 1776).

[7] The English Bill of Rights of 1689 provided "[t]hat excessive bail ought not to be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted." 5 Kurland & Lerner, The Founders' Constitution, p 369, quoting the English Bill of Rights, 1 W & M, 2d sess, ch 2, § 10 (December 16, 1689).

3

Even farther back in time, a prohibition of excessive punishments appeared in the Magna Carta.[8]

" 'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.' "[9] For more than a century, the Supreme Court has maintained that the Clause does not have a fixed meaning,[10] but instead "may acquire meaning as public opinion becomes enlightened by a humane justice."[11] One meaning the Supreme Court has developed over the last decade is that "children are constitutionally different from adults for purposes of sentencing."[12] In *Roper v Simmons*, the Court forbade imposition of the death penalty on juvenile offenders.[13] In *Graham v Florida*, the Court prohibited

---

[8] Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Cal L Rev 839, 845-846 (1969) (The Magna Carta "clearly stipulated as fundamental law a prohibition of excessiveness in punishments[.]"). Caselaw further establishes "a common law prohibition against excessive punishments in any form," even if it remains unclear "[w]hether the principle was honored in practice . . . ." *Id*. at 847.

[9] *Atkins v Virginia*, 536 US 304, 311; 122 S Ct 2242; 153 L Ed 2d 335 (2002), quoting *Trop v Dulles*, 356 US 86, 100; 78 S Ct 590; 2 L Ed 2d 630 (1958) (opinion by Warren, C.J.).

[10] See *Weems v United States*, 217 US 349, 373; 30 S Ct 544; 54 L Ed 793 (1910) ("[I]f we are to attribute an intelligent providence to its advocates we cannot think that it was intended to prohibit only practices like the Stuarts, or to prevent only an exact repetition of history."); *id*. ("[O]ur contemplation cannot be only of what has been but of what may be.").

[11] *Id*. at 378. More recently, the Court has explained that the clause " 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Atkins*, 536 US at 311-312, quoting *Trop*, 356 US at 101 (opinion by Warren, C.J.).

[12] *Miller*, 567 US at __; 132 S Ct at 2464.

[13] *Roper*, 543 US at 578.

"the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."[14]  Most recently, in *Miller v Alabama*, the Court struck down a sentencing scheme that provided a mandatory nonparolable life sentence for juvenile homicide offenders.[15]

In these rulings, the Court relied on three significant differences between juveniles and adults to conclude that juveniles have "diminished culpability" for their crimes and "greater prospects for reform."[16]

> First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking.  Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings.  And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."[17]

---

[14] *Graham*, 560 US at 82.

[15] *Miller*, 567 US at __; 132 S Ct at 2460.

[16] *Id*. at __; 132 S Ct at 2464.  The Court cited research developments in science and social science that show " 'fundamental differences between juvenile and adult minds'— for example, in 'parts of the brain involved in behavior control.' "  *Id*. at __; 132 S Ct at 2464, quoting *Graham*, 560 US at 68.  Specifically, the Court cited a paper by Laurence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence*, which explains that there are two components to the diminished culpability of adolescents: the brain development that continues to occur during adolescence and psychosocial factors limiting adolescents' emotional maturity, such as "(a) susceptibility to peer influence, (b) attitudes toward and perception of risk, (c) future orientation, and (d) the capacity for self-management."  Steinberg & Scott, *Less Guilty by Reason of Adolescence*, 58 Am Psychologist 1009, 1012 (2003).

[17] *Miller*, 567 US at __; 132 S Ct at 2464, quoting *Roper*, 543 US at 569-570 (citations omitted; alterations in original).

These differences between juveniles and adults "diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."[18] In this respect, *Miller* relied heavily on *Graham*, explaining that *Graham* "insist[ed] that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole."[19] Because an offender's age " 'is relevant to the Eighth Amendment,' . . . 'criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.' "[20]

Not only is age relevant in establishing an offender's culpability for the crime, as already explained in this opinion, but it is also relevant in determining whether punishment for a crime is sufficiently comparable in severity to an identical sentence given to an adult offender. Sentencing a juvenile offender to a nonparolable life sentence is " 'especially harsh' " given that the offender "will almost inevitably serve 'more years and a greater percentage of his life in prison than an adult offender.' "[21] Indeed, it "cannot be ignored" that "[a] 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only."[22] As a result, the Supreme Court compared this "ultimate penalty" for juvenile offenders to the death penalty, which

---

[18] *Miller*, 567 US at ___; 132 S Ct at 2465.

[19] *Id.* at ___; 132 S Ct at 2465.

[20] *Id.* at ___; 132 S Ct at 2466, quoting *Graham*, 560 US at 76.

[21] *Miller*, 567 US at ___; 132 S Ct at 2466, quoting *Graham*, 560 US at 70.

[22] *Graham*, 560 US at 70-71.

is the ultimate penalty for adult offenders, rather than to nonparolable life sentences for adult offenders.[23]

In particular, the Supreme Court questioned the ability of mandatory penalties to take into account the unique circumstances of youth: "mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it."[24]  In imposing the harshest penalty available on a juvenile offender, then, "a sentencer misses too much if he treats every child as an adult."[25]  As a result, the Supreme Court required "that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing"[26] a nonparolable life sentence:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.  And finally, this mandatory

---

[23] *Miller*, 567 US at __; 132 S Ct at 2466.

[24] *Id*. at __; 132 S Ct at 2467.

[25] *Id*. at __; 132 S Ct at 2468.

[26] *Id*. at __; 132 S Ct at 2471.

punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.[27]

The Supreme Court invalidated *any* "sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."[28]

It is undisputed—and cannot be disputed—that *Miller* applies to all cases that were pending on direct appeal when the decision was issued on June 25, 2012, and that it applies to all juvenile offenders going forward.[29] What is in dispute in *Carp* and *Davis* is whether *Miller* applies to offenders whose direct appeals were completed before June 25, 2012. After having filed motions for relief from judgment in their respective cases, defendants Raymond Carp and Cortez Davis now appear before this Court, presenting that very issue.[30] On this question, to which we now turn, *Miller* was silent[31] and courts across the country are divided.[32]

---

[27] *Id*. at __; 132 S Ct at 2468 (citations omitted).

[28] *Id*. at __; 132 S Ct at 2469.

[29] "When a decision of this Court results in a 'new rule,' that rule applies to all criminal cases still pending on direct review." *Schriro v Summerlin*, 542 US 348, 351; 124 S Ct 2519; 159 L Ed 2d 442 (2004). A case becomes final on direct review "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari v Bohlen*, 510 US 383, 390; 114 S Ct 948; 127 L Ed 2d 236 (1994). Moreover, the Legislature recognized this when it enacted new procedures for sentencing juvenile offenders in compliance with *Miller*. See MCL 769.25, added by 2014 PA 22. As a result, we would remand *Eliason* to the Berrien Circuit Court for resentencing pursuant to MCL 769.25, as the majority does, because that case was still pending on direct review when *Miller* was decided.

[30] See MCR 6.501 *et seq*.

[31] For the reasons explained later in this opinion, the fact that *Miller* failed to categorically bar imposition of a nonparolable life sentence for juvenile offenders does not require the conclusion that *Miller* is not retroactive. We similarly deem inconclusive

8

## II. RETROACTIVITY UNDER FEDERAL LAW

### A. ANALYSIS

In *Teague v Lane* and its progeny, the United States Supreme Court has explained when its new rules are retroactive under federal law and thereby apply to cases on collateral review.[33]   The threshold inquiry is whether the Supreme Court has, in fact,

as evidence of retroactivity the fact that the Supreme Court did not distinguish *Miller* from a companion case appearing before the Supreme Court on collateral review.  See *Miller*, 567 US at __; 132 S Ct at 2461-2462, 2475; *Jackson v Norris*, 2013 Ark 175; 426 SW3d 906 (2013) (applying *Miller* in that companion case).  Although the Supreme Court indicated in *Teague v Lane* that "implicit in the retroactivity approach we adopt today, is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review," *Teague v Lane*, 489 US 288, 316; 109 S Ct 1060; 103 L Ed 2d 334 (1989) (opinion by O'Connor, J.), it has only inconsistently followed that approach.  See *Chaidez v United States*, 568 US __; 133 S Ct 1103; 185 L Ed 2d 149 (2013) (holding that *Padilla v Kentucky*, 559 US 356; 130 S Ct 1473; 176 L Ed 2d 284 (2010), did not apply retroactively notwithstanding the fact that *Padilla* appeared before the Supreme Court on collateral review).

[32] For example, state appellate courts in California, *In re Rainey*, 224 Cal App 4th 280; 168 Cal Rptr 3d 719; ___ P3d ___ (2014); Illinois, *People v Davis*, 2014 Ill 115595; 379 Ill Dec 381; 6 NE3d 709 (2014); Iowa, *State v Ragland*, 836 NW2d 107 (Iowa, 2013); Massachusetts, *Diatchenko v Dist Att'y*, 466 Mass 655; 1 NE3d 270 (2013); Mississippi, *Jones v State*, 122 So 3d 698 (Miss, 2013); Nebraska, *State v Mantich*, 287 Neb 320; 842 NW2d 716 (2014); and Texas, *Ex parte Maxwell*, 424 SW3d 66 (Tex Crim App, 2014), have all ruled in favor of *Miller*'s retroactivity.  In contrast, state appellate courts in Alabama, *Williams v State*, __ So 3d __ (Ala Crim App, 2014); Louisiana, *State v Tate*, La 2012-2763; 130 So 3d 829 (November 5, 2013); Minnesota, *Chambers v State*, 831 NW2d 311 (Minn, 2013); and Pennsylvania, *Commonwealth v Cunningham*, 81 A3d 1 (Pa, 2013), have ruled that *Miller* is not retroactive.  Additionally, the appellate courts in Florida have reached opposite conclusions on the question of retroactivity.  *Falcon v State*, 111 So 3d 973 (Fla Dist Ct App, 2013) (concluding that *Miller* did not apply retroactively), lv gtd 137 So 3d 1019 (Fla, 2013); *Toye v State*, 133 So 3d 540 (Fla Dist Ct App, 2014) (concluding that *Miller* applied retroactively).

[33] *Teague*, 489 US 288.  Although the lead opinion in *Teague* was not supported in whole by a majority of the court, the *Teague* retroactivity framework has subsequently been

issued a new rule of law. A new rule has been issued and the *Teague* analysis proceeds if "the precise holding[s]" in the Supreme Court's previous cases did not "dictate the result" of the case being analyzed.[34]

Once the reviewing court determines that the Supreme Court issued a new rule of law in the case being analyzed, the reviewing court must then determine whether the new rule is a substantive rule or a procedural rule:

> New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. *Bousley* [*v United States*, 523 US 614, 620; 118 S Ct 1604; 140 L Ed 2d 828 (1998), quoting *Davis v United States*, 417 US 333, 346; 94 S Ct 2298; 41 L Ed 2d 109 (1974)].
>
> New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.[35]

---

adopted by a majority of the Court. *Penry v Lynaugh*, 492 US 302; 109 S Ct 2934; 106 L Ed 2d 256 (1989), overruled in part on other grounds by *Atkins*, 536 US 304. In *Penry*, the majority also determined that the *Teague* framework applied to capital punishment cases. Because sentencing a juvenile offender to a nonparolable life sentence is the "ultimate penalty for juveniles," *Miller*, 567 US at ___; 132 S Ct at 2466, the *Teague* framework similarly applies to nonparolable life sentences for juvenile offenders.

[34] *Saffle v Parks*, 494 US 484, 490; 110 S Ct 1257; 108 L Ed 2d 415 (1990).

[35] *Summerlin*, 542 US at 351-352 (most citations omitted).

A rule is procedural if it "regulate[s] only the manner of determining the defendant's culpability" or if it "allocate[s] decisionmaking authority."[36] On the other hand, "[a] decision that modifies the elements of an offense is normally substantive rather than procedural," including, for example, a decision stating that "a certain fact [is] essential to the death penalty . . . ."[37] Finally, if the new rule is determined to be procedural, then it applies retroactively only if it satisfies the two requirements of a watershed rule of criminal procedure: (1) it must be necessary to prevent an impermissibly large risk of an inaccurate conviction, and (2) it must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.[38] One such watershed rule of criminal procedure was articulated in *Gideon v Wainwright*,[39] which requires the appointment of counsel for any indigent defendant charged with a felony.[40]

## B. APPLICATION

It is uncontested that *Miller* is a new rule, and we agree with the majority's conclusion that "*Miller* imposed a hitherto-absent obligation on state and lower federal

---

[36] *Id*. at 353 (emphasis omitted).

[37] *Id*. at 354.

[38] *Whorton v Bockting*, 549 US 406, 417-418; 127 S Ct 1173; 167 L Ed 2d 1 (2007), citing *Summerlin*, 542 US at 356.

[39] *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963).

[40] *Whorton*, 549 US at 419 (stating that *Gideon* was a watershed rule of constitutional procedure within the meaning of *Teague*).

11

courts to conduct individualized sentencing hearings before imposing a sentence of life without parole on a juvenile homicide offender."[41]

We disagree, however, with the majority's conclusion that *Miller* is best characterized as a procedural ruling such that it applies retroactively to cases on collateral review only if it is a watershed rule of constitutional procedure. Admittedly, the distinction between rules of procedure and rules of substance "is not necessarily always a simple matter to divine."[42] Generally, a substantive rule "place[s] particular conduct or persons covered by the statute beyond the State's power to punish,"[43] while a procedural rule "regulate[s] only the manner of determining the defendant's culpability . . . ."[44]

State legislatures have the "substantive power to define crimes and prescribe punishments,"[45] subject to constitutional limitations. The Supreme Court articulated one such limitation in *Miller*: after *Miller*, state legislatures no longer can *mandate*, like the Michigan Legislature did,[46] that a juvenile offender convicted of first-degree murder in

---

[41] *Ante* at 24. While *Miller* applied principles contained in several of the Court's Eighth Amendment precedents, the "precise holding[s]" of those precedents did not "dictate the result" of *Miller*. See *Saffle*, 494 US at 490.

[42] *People v Carp*, 298 Mich App 472, 512; 828 NW2d 685 (2012), citing *Robinson v Neil*, 409 US 505, 509; 93 S Ct 876; 35 L Ed 2d 29 (1973).

[43] *Summerlin*, 542 US at 352.

[44] *Id*. at 353 (emphasis omitted).

[45] *Jones v Thomas*, 491 US 376, 381; 109 S Ct 2522; 105 L Ed 2d 322 (1989).

[46] See MCL 750.316 (stating that first-degree murder shall be punished by imprisonment for life); MCL 769.1(1) (stating that a juvenile convicted of first-degree murder shall be sentenced "in the same manner as an adult"); MCL 791.234(6)(a) (stating that someone sentenced to life imprisonment for first-degree murder "is not eligible for parole").

the circuit court receive a nonparolable life sentence.[47]  In *Graham*, the Supreme Court

"recognized the severity of sentences that deny convicts the possibility of parole"[48] when

it categorically barred a state from imposing a nonparolable life sentence (whether

discretionary or mandatory) on a juvenile nonhomicide offender.  While *Miller* does not

prohibit a sentencer from imposing a nonparolable life sentence on a juvenile homicide

offender in the appropriate case, the Supreme Court categorically barred mandatory

nonparolable life sentences for such offenders.

After *Miller*, if a state chooses to permit the sentencing of juveniles to

nonparolable life,[49] then the state must provide some procedure that requires the

sentencer to consider the particular facts and circumstances of the crime and the offender.

The Court of Appeals and, to some extent, the majority have placed particular importance

on a single line in *Miller*: that the decision "mandates only that a sentencer follow a

certain process . . . before imposing a particular penalty."[50]  However, the mere fact that

*Miller* mandates "a certain process," or has procedural implications, does not transform

the decision itself into a procedural decision.  To the contrary, *Miller* invalidated *an*

---

[47] Indeed, the majority acknowledges that "[i]t thus seems certain as a result of *Miller* that a considerable number of juvenile defendants who would previously have been sentenced to life without parole for the commission of homicide offenses will have a lesser sentence meted out." *Ante* at 25.

[48] *Graham*, 560 US at 70.

[49] Michigan has recently done so.  2014 PA 22.

[50] *Miller*, 567 US at __; 132 S Ct at 2471.

*entire "sentencing scheme"* that "mandate[d] life in prison without possibility of parole for juvenile offenders."[51]

The majority claims that the distinction between the "categorical bar" of a penalty and the "noncategorical bar" of a penalty "defines the critical element of the retroactivity analysis in *Teague*."[52] This distinction, however, is not dispositive to the *Teague* analysis, which focuses on whether the decision is substantive or procedural, not on whether it is categorical or noncategorical. By elevating the categorical/noncategorical distinction in the way it does, the majority muddles the *Teague* analysis to state that noncategorical bars *must* be procedural in nature. Even if all categorical bars are substantive, it does not logically follow that all noncategorical bars must be procedural.[53] Rather, for the reasons stated later in this opinion, the fact that *Miller* did not categorically bar nonparolable life sentences for juvenile offenders does not negate the substantive import of its decision to invalidate mandatory nonparolable life sentences as applied to juvenile offenders.

The substantive nature of *Miller*'s holding becomes clearer upon considering that it did not invalidate mandatory sentencing schemes as applied to adult offenders.[54]

----

[51] *Id*. at __; 132 S Ct at 2469 (emphasis added).

[52] *Ante* at 38 n 16.

[53] The division among our nation's courts with regard to whether this proposition is correct or incorrect suggests that our nation's jurisprudence would benefit from a clarification of the substantive/procedural distinction.

[54] In Michigan, for instance, first-degree murder remains punishable by life in prison without the possibility of parole. MCL 750.316; MCL 791.234(6).

Rather, in *Miller*, the Supreme Court made one fact—the age of the offender at the time of the offense—determinative regarding whether a state or the federal government can *mandate* the imposition of a nonparolable life sentence.[55] As a result, *Miller* did not alter "*only* the manner of determining the defendant's culpability,"[56] but instead also altered the range of punishments that *must* be available to impose on a juvenile offender.

After *Miller*, the offender's age at the time of the offense determines which of two sentencing schemes applies to the offender—that is, whether the offender is subject to a mandatory nonparolable life sentence (because the offender is an adult) or whether the sentence must take into account the offender's age and characteristics of youth, as well as the circumstances of the offense (because the offender is a juvenile).[57] While previously, in Michigan, juvenile offenders convicted of first-degree murder in the circuit court were subject to only one possible punishment—life imprisonment without the possibility of parole—after *Miller*, the prosecution must specifically request a nonparolable life sentence, rather than a term of years, after which the court must hold a hearing to consider the offender's characteristics and the circumstances of the offense before

---

[55] In *Summerlin*, the Supreme Court explained that a decision making "a certain fact essential to the death penalty" is a substantive rule of law within the *Teague* framework. *Summerlin*, 542 US at 354.

[56] *Summerlin*, 542 US at 353 (emphasis altered).

[57] Someone who is convicted of first-degree murder committed as an adult in Michigan is still subject to the mandatory penalty of life in prison without the possibility of parole, MCL 750.316; MCL 791.234(6)(a), while a juvenile offender is no longer subject to the same mandatory sentence. MCL 769.25.

deciding whether to impose a nonparolable life sentence or a term of years.[58]  As a result,

age affects the range of sentences that can be imposed on someone convicted of first-

degree murder in Michigan.  It produces a class of persons subject to a different range of

sentences than was previously mandated and thus reflects a substantive rule of law that

applies retroactively under the *Teague* framework.

The majority analyzes what it deems the "form and effect" of *Miller* and

concludes differently.  Under its rationale, *Miller* is not retroactive in large part because

the Supreme Court did not categorically bar a sentence as applied to a class of

individuals, which it did in *Roper* and *Graham*.  Rather, juvenile offenders sentenced to

nonparolable life have been given a punishment that is within the power of the state to

impose.  The majority thus determines that *Miller* is more similar to cases involving the

individualized imposition of the death penalty, which, the majority asserts, are cases

involving new procedural rules.

The majority is insightful, to a point, by comparing *Miller* with *Woodson v North*

*Carolina*, which struck down a sentencing scheme that mandated the death penalty upon

conviction of certain offenses.[59]  Indeed, after *Woodson*, the Supreme Court requires an

---

[58] It is particularly relevant that *Miller* left considerable discretion for states to craft procedural mechanisms for ensuring the protection of a juvenile defendant's Eighth Amendment rights.  The Legislature exercised such discretion in response to *Miller*, 2014 PA 22, adding MCL 769.25.

[59] *Woodson v North Carolina*, 428 US 280; 96 S Ct 2978; 49 L Ed 2d 944 (1976).  See also *Sumner v Shuman*, 483 US 66; 107 S Ct 2716; 97 L Ed 2d 56 (1987), which similarly struck down a sentencing scheme that mandated the death penalty upon conviction of certain offenses committed while serving a nonparolable life sentence.

individualized sentencing procedure if a state chooses to impose the death penalty.[60] *Woodson* also illustrates the problem with the majority's method of distinguishing procedural from substantive holdings. The majority claims that substantive holdings "produce a single invariable result, or a single effect, when applied to *any* defendant in the class of defendants to whom the rule is pertinent," while procedural holdings "produce a range of results, or have multiple possible effects, when applied to *different* defendants in the class of defendants to whom the rule is pertinent."[61] In requiring an individualized procedure before a state can impose the death penalty, however, *Woodson* placed a particular punishment beyond the power of the state to *mandate*. So too did *Miller* place a particular punishment beyond the power of the state to mandate. The majority's distinction fails to give appropriate import to these decisions that involve more than simply the creation of particular procedural rights.

While *Woodson* required a state to provide *some* sort of procedural mechanism before it could impose capital punishment, it only offered minimal guidance on what procedures are required and, specifically, on who should decide whether an individual was eligible to receive the death penalty. After *Woodson*, some states listed aggravating factors that rendered an offense eligible for the death penalty. The Supreme Court subsequently held, in *Ring v Arizona*, that the Sixth Amendment right to a jury trial

---

[60] If the Supreme Court had definitively held *Woodson* to be a procedural ruling, then it would be difficult to distinguish *Miller*. However, if the Supreme Court has not ruled that *Woodson* is retroactive, as the majority posits, then neither has it ruled that *Woodson* is *only prospective*.

[61] *Ante* at 16-17.

requires a jury to determine the presence or absence of the aggravating factors that qualify an offender as death-eligible.[62]

In *Schriro v Summerlin*, the Supreme Court determined that *Ring* was procedural, and therefore not retroactive, because the aggravating factors at issue there remained "subject to the procedural requirements the Constitution attaches to trial of elements."[63] The prototypical procedural decision merely "allocate[s] decisionmaking authority."[64] Unlike *Ring*, *Miller* does more than merely allocate decision-making authority. While *Ring* only "altered the range of *permissible methods* for determining whether a defendant's conduct is punishable by death,"[65] *Miller* went beyond that and altered the range of *punishments* available to a juvenile homicide offender by requiring that a state's mandatory minimum punishment be something less than nonparolable life. Indeed, it does not simply allocate decision-making authority but *establishes that authority in the first instance*. The majority implicitly recognizes this by observing that, as *Ring* shifted the decision-making authority for imposing capital punishment from the judge to the jury,

---

[62] *Ring v Arizona*, 536 US 584; 122 S Ct 2428; 153 L Ed 2d 556 (2002).

[63] *Summerlin*, 542 US at 354.

[64] *Id*. at 353.

[65] *Id*. (emphasis added). Contrary to the majority's claim, *ante* at 36 n 14, *Ring* did not invalidate Arizona's entire capital punishment sentencing scheme because both before and after *Ring* the same substantive punishments were available for offenders in Arizona. Rather, it shifted decision-making authority *within* that sentencing scheme from the judge to the jury. By contrast, in *Miller*, the Supreme Court invalidated *any* sentencing scheme that mandated a nonparolable life sentence by requiring the sentencer to consider some additional sentence—whether parolable life, a term of years (as the Michigan Legislature chose), or both.

18

*Miller* shifted the decision-making authority from one branch of government (the legislative) to another (the judiciary).[66]  Put simply, *Miller* involved not just who exercises the decision-making authority for imposing a punishment, but *what* punishments must be considered.

The majority glosses over the substantive import of this distinction, and in doing so ignores the fact that, both before and after *Ring*, there existed the possibility for a punishment less than death, while only after *Miller* does there exist the possibility for a juvenile homicide offender to receive a punishment less than nonparolable life.[67]  While *Miller* indisputably contains a procedural component, its decision to expand the range of punishments that may be imposed on juvenile offenders convicted of homicide squarely

---

[66] *Ante* at 36.

[67] Interestingly, the majority suggests that Justice Breyer's concurring opinion in *Miller*, had it received majority support, would be deemed a substantive rule and thus would apply retroactively.  *Ante* at 19 n 6.  Justice Breyer would have conditioned the state's ability to impose a nonparolable life sentence on whether the individual homicide offender " 'kill[ed] or intend[ed] to kill' " the victim.  *Miller*, 567 US at __; 132 S Ct at 2475 (Breyer, J., concurring), quoting *Graham*, 560 US at 69 (alterations in original).  But both Justice Breyer's concurrence and Justice Kagan's majority opinion condition the imposition of a nonparolable life sentence on an assessment of a particular defendant's culpability for a homicide offense and allow only a subset of individuals convicted of first-degree murder to be eligible for a nonparolable life sentence.  Accordingly, the distinction that the majority creates between the majority and concurring opinions in *Miller* is without a difference and counsels in favor of applying *Miller* retroactively: while previously no limitation existed before a state could impose a nonparolable life sentence as punishment for a homicide offense, now an offender's individual culpability in the homicide must be assessed.  The *Miller* majority's individualized procedure contains additional factors that govern whether a defendant may be punished with nonparolable life, and Justice Breyer's proposed individualized procedure would work in the same manner.  Each invalidates the substantive, mandatory punishment that certain states imposed for juvenile offenders convicted of homicide.

places *Miller* in the category of substantive decisions.[68]  No longer can Congress or a state legislature constitutionally choose to adopt a sentencing scheme that mandates the imposition of a nonparolable life sentence on juvenile homicide offenders.[69]

Indeed, if *Miller* were merely a procedural decision, the Supreme Court would not have examined—and found wanting—the penological aims of a state legislature's substantive policy choice to impose a mandatory nonparolable life sentence on juvenile homicide offenders.  In fact, in *Miller*, the Court explained that *none* of the permissible penological aims—retribution, deterrence, incapacitation, and rehabilitation—warrant mandatory nonparolable sentences for juvenile offenders.[70]  Similarly, in *Atkins v*

---

[68] The majority claims that "[w]e are bound to abide by" the Supreme Court's understanding of "when a new rule 'alters the range' of available punishments," and suggests that this applies *only* when the rule " 'place[s] particular conduct or persons covered by the statute *beyond the State's power to punish.*' "  *Ante* at 30-31, quoting *Summerlin*, 542 US at 352 (alteration in original).  However, *Summerlin*'s description of a substantive rule is inclusive and not exclusive, and the majority overstates the Supreme Court's position when it forecloses, on the basis of that statement in *Summerlin*, the possibility that a substantive decision is one that "makes a previously unavailable lesser punishment available to the sentencer . . . ."  *Ante* at 30.

[69] To the majority, a rule that "merely expands the range of possible punishments that may be imposed on the defendant" is procedural because, in theory, the state still has the power to punish a juvenile offender with a nonparolable life sentence.  *Ante* at 35 (emphasis omitted).  However, this distinction is misplaced because the Supreme Court nevertheless placed a substantive limitation on a state's policy decisions: after *Miller* the state no longer has the power to mandate a nonparolable life sentence as punishment for a crime committed by a juvenile offender.

[70] For instance, retribution as a penological rationale "relates to an offender's blameworthiness" and, accordingly, " 'the case for retribution is not as strong with a minor as with an adult.' "[70]  *Miller*, 567 US at ___; 132 S Ct at 2465, quoting *Graham*, 560 US at 71 (citation and quotation marks omitted).  Deterrence is similarly limited because " 'the same characteristics that render juveniles less culpable than adults'—their immaturity, recklessness, and impetuosity—make them less likely to consider potential

---

20

*Virginia*, the Supreme Court examined the penological justifications for imposing the death penalty on mentally handicapped individuals and found those justifications lacking.[71]

Nevertheless, *Atkins* acknowledged that states are provided with considerable discretion to fashion procedures to determine whether an offender must be excluded from consideration of the death penalty:

> Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright* with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."[72]

---

punishment" before committing a crime. *Miller,* 567 US at __; 132 S Ct at 2465, quoting *Graham*, 560 US at 72 (citation and quotation marks omitted). Incapacitation "would require 'mak[ing] a judgment that [the offender] is incorrigible'—but 'incorrigibility is inconsistent with youth.' "[70] *Miller*, 567 US at __; 132 S Ct at 2465, quoting *Graham*, 560 US at 72-73 (citation and quotation marks omitted) (first alteration in original). See also Steinberg & Scott, *Less Guilty by Reason of Adolescence*, 58 Am Psychologist at 1014 ("Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood . . . ."). Nor can a nonparolable life sentence "be justified by the goal of rehabilitation" because it "forswears altogether the rehabilitative ideal" and "makes an irrevocable judgment about that person's value and place in society." *Graham*, 560 US at 74. See also Steinberg & Scott, *Less Guilty by Reason of Adolescence,* 58 Am Psychologist at 1015 (stating that because the criminal behavior of juvenile offenders, "is quite different from that of typical adult criminals," the diagnosis of antisocial personality disorder is not made before the age of 18).

[71] *Atkins,* 536 US at 321 ("We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty.").

[72] *Id*. at 317, quoting *Ford v Wainwright*, 477 US 399, 405, 416-417; 106 S Ct 2595; 91 L Ed 2d 335 (1986) (citation omitted) (alterations in original).

*Miller* likewise provided states with considerable discretion to determine how a juvenile offender is to be adjudged sufficiently culpable as an individual to warrant imposition of a nonparolable life sentence.[73] In other words, after *Atkins*, a court must make an individual determination of whether an offender's mental capacity precludes consideration of the death penalty.[74] After *Miller*, so too must a court make an individual determination of whether a juvenile offender's youth and attendant characteristics preclude consideration of a nonparolable life sentence.[75] That *Atkins* required states to provide additional procedural safeguards to ensure that they complied with the substantive limitations of the Eighth Amendment does not negate its substantive nature,[76]

---

[73] If, for instance, the Supreme Court were to hold in a subsequent decision that the Sixth Amendment right to a jury trial requires a jury to determine a juvenile offender's culpability for purposes of imposing a nonparolable life sentence, then that hypothetical future holding would be considered procedural rather than substantive. See *Summerlin*, 542 US 348.

[74] This individual determination, made under state law, also shows the weakness of the majority's "form and effect" interpretation of *Teague*, which requires a substantive decision to have uniform effect. Because *Atkins* left states with considerable discretion to define mental retardation, a person whose mental capacity precludes consideration of the death penalty in one state could nevertheless be subject to the death penalty in a different state. The majority struggles to fit *Atkins* within its "form and effect" interpretation— particularly given that the state's exercise of its discretion both in *Miller* and *Atkins* is to ensure that only culpable offenders are subject to the ultimate punishment available to juvenile offenders and adults, respectively.

[75] Furthermore, just as "some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards," *Atkins*, 536 US at 317, some characteristics of youth likewise undermine the existing procedural protections in our justice system, including the right to the effective assistance of counsel, *Miller*, 567 US at __; 132 S Ct at 2468 (suggesting that a juvenile offender may be prejudiced because of "his incapacity to assist his own attorneys").

[76] *In re Holladay*, 331 F3d 1169, 1172 (CA 11, 2003) (holding that *Atkins* applies retroactively).

just as *Miller*'s requirement of new procedural safeguards does not negate its substantive nature.  In other words, neither *Atkins* nor *Miller* defined precisely the class of offenders precluded from a particular punishment; rather, fact-finders must examine *individual* culpability to determine whether a particular offender is eligible for that punishment.  The broad deference thus afforded to states in the adjudication of the individualized hearings required under *Atkins* and *Miller* only reinforces the substantive nature of those holdings.

In the end, the majority strains to place *Miller* in a procedural box into which it will not comfortably fit.  *Miller* is based on the substantive differences between juveniles and adults and the potentially reduced culpability of juveniles for the crimes that they commit.  While there are procedural implications to the decision—as *Miller* itself acknowledged—the "form and effect" of the opinion, to use the majority's phrase, is that the Eighth Amendment places a substantive limitation on how states can punish juvenile offenders.  Accordingly, we would hold that *Miller* applies retroactively under federal law.

Even if we were to agree with the majority that *Miller* announced a new rule of criminal procedure, which we do not, an alternative basis supports our conclusion that *Miller* should apply retroactively.  That is, as a separate and independent matter, we would hold that *Miller* applies retroactively under state law.  It is to that analysis that we now turn.

## III.  RETROACTIVITY UNDER MICHIGAN LAW

### A.  ANALYSIS

This Court has consistently asserted that three factors are relevant in determining whether a new rule of criminal procedure should be applied retroactively under state law,

even if such a new rule of criminal procedure does not apply retroactively under federal law:

> (1) the purpose of the new rules; (2) the general reliance on the old rule[;] and (3) the effect of retroactive application of the new rule on the administration of justice.[77]

The county prosecutors involved in these cases and the Attorney General argue that this Court should reverse this existing caselaw and rule that the retroactivity analysis under Michigan law is identical to the retroactivity analysis under federal law as articulated in *Teague* and its progeny. They claim that our caselaw is outdated because it applies the test for retroactivity that the Supreme Court abandoned in *Teague*.[78] The Supreme Court, however, has explicitly recognized that *Teague*'s approach to retroactivity incorporates federalism and comity concerns that "are unique to *federal* habeas review of state convictions."[79] Therefore, "[i]f anything, considerations of comity militate in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by *Teague*."[80] To this end, we duly concluded only six years ago that "a state court may use a different test to give broader effect to a new rule of criminal procedure established by the United States Supreme Court."[81] There is no reason to abandon that approach now.

---

[77] *People v Sexton*, 458 Mich 43, 60-61; 580 NW2d 404 (1998).

[78] See *Linkletter v Walker*, 381 US 618, 626; 85 S Ct 1731; 14 L Ed 2d 601(1965).

[79] *Danforth v Minnesota*, 552 US 264, 279; 128 S Ct 1029; 169 L Ed 2d 859 (2008).

[80] *Id*. at 279-280.

[81] *People v Maxson*, 482 Mich 385, 392 n 3; 759 NW2d 817 (2008). See also *id*. at 404-405 (CAVANAGH, J., dissenting).

B. APPLICATION

As stated, the first factor that a reviewing court must consider in assessing a new rule's retroactivity under state law is the purpose of the new rule. "Under the 'purpose' prong, a law may be applied retroactively when it 'concerns the ascertainment of guilt or innocence[,]' however, 'a new rule of procedure . . . which does not affect the integrity of the fact-finding process should be given prospective effect.' "[82]   While sentencing procedures do not concern the ascertainment of guilt or innocence for the underlying offense, sentencing is a fact-finding process that allows the sentencer to ascertain an offender's culpability for the offense.[83]   Indeed, *Miller* mandates a *new* fact-finding

---

[82] *Maxson*, 482 Mich at 393, quoting *Sexton*, 458 Mich at 63 (citation and quotation marks omitted).

[83] See *McConnell v Rhay*, 393 US 2, 3-4; 89 S Ct 32; 21 L Ed 2d 2 (1968) (stating that sentencing relates to the integrity of the fact-finding process under *Linkletter*).   The majority reads *McConnell* narrowly on the ground that *McConnell* implicated the right to counsel during the sentencing process.   However, it did so precisely because the sentencing process *is* part of the fact-finding process.   Indeed, this Court's own jurisprudence involving sentencing describes the sentencing process as requiring the sentencing court to make "factual determination[s]."   See, e.g., *People v Babcock*, 469 Mich 247, 264; 666 NW2d 231 (2003) (citations and quotation marks omitted).   The fact that this Court has not yet had the opportunity to analyze the sentencing process in the context of retroactivity does not prevent the principles that we have articulated from applying in this context.

Contrary to the majority's claim, it is irrelevant that the Supreme Court has abandoned the pre-*Teague* framework in determining the application of this state's independent retroactivity jurisprudence.   Indeed, saying that this Court has "no obligation . . . to forever maintain the *Linkletter* test in accordance with every past federal understanding," *ante* at 51, classifying the foundational caselaw of Michigan's retroactivity test as "defunct," *ante* at 52, and stating that "only the extraordinary new rule of criminal procedure," whatever that may mean, "will be applied retroactively under Michigan's test when retroactivity is not already mandated under *Teague*," *ante* at 49 comes perilously close to deciding to maintain the principles underlying this state's traditional retroactivity framework *only* when *Teague* and its progeny militate in favor of

25

process to determine whether a nonparolable life sentence is appropriate in a particular case. As a result, this factor supports the retroactive application of *Miller*.

The second factor "examines whether individual persons or entities have been 'adversely positioned . . . in reliance' on the old rule."[84] Detrimental reliance on the old rule can apply to defendants who have "suffered harm as a result of that reliance" when they would have pursued an appeal that "would have resulted in some form of relief."[85] In these cases, defendants were adversely positioned in reliance on the old rule because the sentencing judges did not have discretion to provide a sentence other than nonparolable life and because, until *Miller*, there was no basis in existing caselaw to appeal this lack of discretion.[86] Moreover, because the Supreme Court stated that

retroactivity. We would not turn Michigan's retroactivity framework into such a parchment barrier. See Federalist No. 48 (James Madison) (Wright ed, 2002), p 343.

[84] *Maxson*, 482 Mich at 394 (citation omitted).

[85] *Id*. at 394, 396 (emphasis omitted).

[86] Indeed, Davis's sentencing judge sought to sentence him to a term of years instead of a nonparolable life term and was overturned on the prosecution's appeal. This fact alone illustrates how defendants as a class were adversely positioned in reliance on the old rule—after *Miller*, every defendant is entitled to "some form of relief," i.e., an individualized sentencing hearing that allows the sentencer to consider a punishment less than nonparolable life. *Maxson*, 482 Mich at 396 (emphasis omitted). Unlike in *Maxson*, we cannot assume that juvenile offenders did not appeal their nonparolable life sentences "because of factors unrelated to, and existing before, the old rule." *Id*. Instead, we must assume that any failure to appeal occurred simply because the old rule provided no judge with discretion to deviate from a nonparolable life sentence. That Michigan caselaw upheld the constitutionality of our pre-*Miller* sentencing scheme, see *People v Launsburry*, 217 Mich App 358; 551 NW2d 460 (1996), further supports defendants' detrimental reliance on the old rule because it reduced the likelihood that a mandatory nonparolable life sentence would have been overturned on appeal.

26

imposition of nonparolable life sentences would be "uncommon"[87] after *Miller*, it is

likely that many of the juvenile offenders already serving nonparolable life sentences

would have, in fact, been sentenced to a term of years if they had received a sentencing

hearing pursuant to *Miller*. As a result, this factor also supports the retroactive

application of *Miller*.[88] Nevertheless, this prong is not dispositive: a reviewing court

must balance the detrimental reliance on the old rule "against the other . . . factors, as

---

[87] *Miller*, 567 US at ___; 132 S Ct at 2469.

[88] It bears repeating *Miller*'s statements that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be *uncommon*" and that only the "*rare* juvenile offender" will commit a crime that "reflects irreparable corruption." *Id*. at ___; 132 S Ct at 2469 (emphasis added) (citations and quotation marks omitted). As a result, the majority's claim that it is "speculative at best" to presume that juvenile offenders will gain relief under *Miller*, is indeed questionable. *Ante* at 60-61.

Furthermore, contrary to the majority's assertion that chronological age at the time of the offense "will weigh relatively heavily at sentencing hearings," *ante* at 60 n 35, a juvenile offender's chronological age is only one relevant consideration in determining whether the offender deserves a "sentence of life (and death) in prison." *Miller*, 567 US at ___; 132 S Ct at 2468. Indeed, under *Miller*, a sentencer must consider the offender's chronological age, mental and emotional development, family and home environment, and potential for rehabilitation, along with the circumstances of the offense, which include the individual offender's role in the crime and whether familial and peer pressures may have affected the juvenile. *Id*. at ___; 132 S Ct at 2468. Simply stated, under *Miller*, a sentencer must "examine *all* these circumstances *before* concluding that life without any possibility of parole [is] the appropriate penalty." *Id*. at ___; 132 S Ct at 2469 (emphasis added). The majority, however, places "significant weight" on a juvenile's chronological age at the time of the offense. *Ante* at 60 n 35. By stating that a juvenile who nears the age of majority at the time of the offense is "least likely" to be afforded "special leniency," *ante* at 60, that a juvenile "may even turn 18 during the proceedings related to the offense," *ante* at 60 n 35, that a nonparolable life sentence is "increasingly likely to be permissible" to the extent the offender's age nears the age of majority, *ante* at 22 n 9, and that age "may well constitute the single best factor" for determining culpability, *ante* at 60 n 35, the majority makes generalizations that ignore *Miller*'s multifaceted and holistic examination of the offender's individual characteristics.

well as against the fact that each defendant . . . has received all the rights under the law to which he or she was entitled at the time."[89]

Indeed, applying the third factor takes into account this reliance on the old rule by examining whether applying the new rule retroactively would undermine the state's "strong interest in finality of the criminal justice process . . . ."[90] Nevertheless, this factor does not counsel against retroactivity in the way the majority asserts it does. Simply put, applying *Miller* retroactively would not affect the finality of convictions in this state. Rather, it would only require an individualized resentencing process for the relatively small class of prisoners sentenced to nonparolable life for homicides that they committed while juveniles.[91]

---

[89] *Maxson*, 482 Mich at 397. The majority concludes that this second factor "must be considered both from the perspective of prosecutors across the state when prosecutors faithfully abided by the constitutional guarantees in place at the time of a defendant's conviction," and "from the collective perspective of the 334 defendants who would be entitled to resentencing if the new rule were applied retroactively." *Ante* at 55. However, that principle is not found in this Court's traditional caselaw regarding retroactivity, and the authoring justice's own examination of retroactivity in *People v Maxson* did not engage in such an additional inquiry. See *Maxson*, 482 Mich at 394-397. Indeed, as *Maxson* acknowledged, our traditional caselaw regarding retroactivity requires us to balance the other factors "against the fact that each defendant . . . has received all the rights under the law to which he or she was entitled at the time." *Id*. at 397. The majority's application of our retroactivity caselaw gives the state's reliance interests undue weight by factoring those interests twice—once as part of the second factor and again as part of the third factor. The majority has not pointed to any reasons that would support revisiting the authoring justice's examination of retroactivity in *Maxson* in the six years since it was decided.

[90] *Maxson*, 482 Mich at 397.

[91] If *Miller* resentencing hearings were to be evenly divided among the circuit court bench, each circuit judge would receive, on average, two additional sentencing hearings. That is hardly a strain on the state's judicial resources. This is in stark contrast to the potential of "guilty-pleading defendants whose convictions [had] become final [to]

28

The majority concludes that requiring a sentencing hearing for offenders whose direct appeals are complete would be "burdensome and complicated," if not "almost impossibl[e]. . . ."[92] Setting aside the majority's doubt regarding the possibility of reconstructing the evidence required to conduct such a hearing, *Miller*'s goal is to determine, as best as possible, a juvenile offender's ability to reform.[93] A sentencing hearing under *Miller*—particularly one conducted many years or even decades after the original offense—will assist in determining whether an offender "pose[s] a physical threat . . . to individuals living in our most vulnerable neighborhoods"[94] and, consequently, is irreparably corrupt.[95] This is particularly true in Michigan, where the Legislature has decided that a hearing conducted pursuant to *Miller* may take into

---

inundate the appellate process with new appeals" that, in part, prompted a majority of this Court to reject the retroactivity of *Halbert v Michigan*, 545 US 605; 125 S Ct 2582; 162 L Ed 2d 552 (2005). *Maxson*, 482 Mich at 398.

[92] *Ante* at 61-62. The law, and particularly judicial proceedings, are frequently burdensome and complicated. That the Constitution sometimes *requires* burdensome and complicated proceedings should not impede our duty to ensure that constitutional rights are enforced.

[93] The majority's emphasis on reconstructing the circumstances of the crime and the impulsiveness of the juvenile offender's activity is misplaced. As a result, the majority misinterprets the hearing called for under *Miller* as entirely backward-looking. *Miller*'s goal is to ensure that the sentencing court considers the evidence that it has available to it in deciding whether an individual offender has the ability to reform.

[94] *Ante* at 62.

[95] See *Miller*, 567 US at ___; 132 S Ct at 2469.

29

account changed circumstances, including post-arrest conduct.[96]   Accordingly, the majority errs by asserting that it is "fanciful" to believe that *Miller* can effectively be applied retroactively or that applying *Miller* retroactively will inevitably result in the "premature release of large numbers of persons" who "continue to pose a physical threat . . . ."[97]

Because each of these factors supports retroactive application of *Miller* under state law, we would hold that independent state law grounds exist to apply *Miller* retroactively.

## IV. CONCLUSION

For the reasons stated in this opinion, we respectfully dissent from the majority's decision not to apply *Miller v Alabama* retroactively under either federal or state law. Instead, we would reverse the Court of Appeals in *Carp* and *Davis* and remand to the St. Clair Circuit Court and Wayne Circuit Court, respectively, for resentencing pursuant to MCL 769.25a.[98]   Because *Miller* struck down sentencing schemes that applied mandatory nonparolable life sentences to juvenile homicide offenders, it altered the range of sentences that may be imposed on a juvenile homicide offender and effected a substantive change in the law.   The majority has ruled that not all juvenile offenders will receive the benefit of *Miller*'s decision to foreclose a state from mandating a

---

[96] See MCL 769.25(6) (allowing the sentencing court to consider at the sentencing hearing under *Miller* "any other criteria relevant to its [sentencing] decision, including the individual's record while incarcerated").

[97] *Ante* at 62-63.

[98] As previously indicated, we would also remand *Eliason* to the Berrien Circuit Court for resentencing pursuant to MCL 769.25, as the majority does.

nonparolable life sentence, notwithstanding the Supreme Court's assertion that only the "*rare* juvenile offender" will commit a crime that "reflects irreparable corruption" punishable by a nonparolable life sentence.[99]  As a result, although *Miller* held that "children are different" as a matter of constitutional law,[100] today's decision ensures that, merely because of the timing of a conviction and appeal, some children are more different than others.

Mary Beth Kelly
Michael F. Cavanagh
Bridget M. McCormack

---

[99] *Miller*, 567 US at __; 132 S Ct at 2469 (emphasis added) (citations and quotation marks omitted).

[100] *Id.* at __; 132 S Ct at 2470.